Frank Woodbury, as Trustee of the Estate of F. J. Woodbury and J. P. Woodbury's Interest herein, Appellant, v. George Glick, Holland Lot & Land Co., Charles Glick, F. E. Glick, C. J. Lander, Alice Fletcher, T. J. Fletcher and A. G. Glick, Appellees.

Negotiable instruments: ACCOMMODATION NOTES: FRAUD: EVIDENCE. In this action for an accounting and equitable relief in the form of a judgment upon certain promissory notes, the evidence is reviewed and held to show that the notes executed to a bank were for the accommodation of the bank and its officers.

Same: ASSIGNMENTS: bona fide HOLDER: RECOVERY. An ·assignee of notes made for the accommodation of a bank, and assigned by it for the benefit of former owners of the bank, is not a holder in due course and can not recover thereon if the bank itself could not have done so.

Judgments: CONFORMITY TO ISSUES. Where one party to a suit makes no claim to a contract beneficial to a third party, and the other party seeking its recovery shows no right to its possession, a judgment entirely ignoring the matter was proper.

Same: CANCELLATION OF INSTRUMENTS. The dismissal of an action upon past due notes, made for the accommodation of plaintiff's assignor, is in fact a judgment for their cancellation; and the makers can not complain that the decree does not order their delivery for cancellation and enjoin a transfer of the same.

*Appeal from Marshall District Court.*—Hon. C. B. Bradshaw, Presiding Judge.

Wednesday, July 5, 1911.

Action for accounting and for equitable relief. The particular form of relief contended for in argument is a judgment against each maker for balance due on· each of

three promissory notes signed, respectively, by each of three defendants, viz., Charles Glick, F. E. Glick, and C. J. Lander. Nothing is now claimed against the other defendants. The trial court dismissed the petition, and the plaintiff has appealed.—*Affirmed.*

*Burnham & Egermayer* and *J. L. Carney,* for appellant.

*Boardman & Lawrence,* for appellees save Holland Lot & Land Co.

EVANS, J.—The plaintiff holds his cause of action by written assignment executed by the First National Bank of Marshalltown to the plaintiff as trustee for F. J. Woodbury and J. P. Woodbury. The plaintiff is the son of F. J. Woodbury. F. J. Woodbury and J. P. Woodbury are brothers. For many years and up to 1907, they were the owners of practically all of the stock of the First National Bank of Marshalltown. From October, 1893, to May, 1907, J. P. Woodbury was the president of such bank. For many years prior to October, 1893, George Glick was the president of such bank. Charles Glick, F. E. Glick and A. G. Glick are sons of George Glick. Alice Fletcher is the daughter of George Glick and the wife of T. J. Fletcher. T. J. Fletcher was the cashier of said bank both prior to 1893 and thereafter for many years. C. J. Lander was a friend of George Glick, and was distantly related to him by marriage; his wife being a niece of George Glick. The Holland Lot & Land Company was a corporation which had been organized and promoted by George Glick and others many years prior to 1893, and which became heavily indebted to the First National Bank. The affairs of this corporation were wound up and the corporation dissolved by a formal order of court in 1894. The above named are all made parties defendant.

As assignee of the First National Bank, the plaintiff claims to hold a note of $6,000 executed by Charles Glick on June 10, 1906; a note of $5,300 executed by F. E. Glick on January 17, 1907; a note of $3,342 executed by F. E. Glick on January 17, 1907; a note of $5,000 executed by C. J. Lander on January 21, 1907; a note of $3,678.16 executed by Holland Lot & Land Company by George Glick, president, on March 3, 1907. The First National Bank of Marshalltown is named as the payee in all of the above described notes. The alleged defenses are manifold and we shall not take time or space to set them all forth. All the defenses center about the proposition that the notes referred to were accommodation notes only, and that they were executed without any consideration whatever and without any intent on the part of the makers or the payee that they were to be paid. That they were accommodation notes executed without any consideration to the makers is undisputed. But it is contended by the plaintiff that the party accommodated was George Glick, and he alone. It is claimed that the bank parted with a consideration, in that it accepted such notes in lieu of the obligation of George Glick for a like amount, and that it discharged the obligations of George Glick to such extent. For the defendants it is claimed among other things that the notes were executed for the accommodation of the bank as such; that they were executed by the makers and received by the bank only for the purpose of enabling the bank to conceal from the bank examiners the extent of the indebtedness of George Glick to such bank, and that they were so received by the bank without any consideration whatever. The field of the defense is much broader than this; but, in view of our conclusions upon this question, we shall have no occasion to deal with other questions which have been extensively argued by both sides.

I. Each of the notes in question is the last of a series of renewals, extending over a period of fifteen or sixteen

years or more.  The first note of each defendant was exe-
cuted some time prior to October, 1893, and
renewal notes were successively executed for
a like amount every six months from that
time to 1907.  The real occasion for the
execution of the notes was that the defendant George Glick
had become so heavily indebted to the bank that it could
not pass the inspection of the government bank examiners.
This indebtedness was somewhat over $38,000.  Under the
law the bank could not lawfully loan to one borrower in
excess of $10,000, its capital stock being only $100,000.
In order to conceal this violation of the law, Glick exe-
cuted his note to the bank for $9,950, and indorsed as
guarantor accommodation notes of the defendants for the
various amounts hereinafter indicated.  He also turned
over to the bank as collateral security all his property.
In October, 1893, he was succeeded as president by J. P.
Woodbury.  He, however, became vice president and con-
tinued as director of the company.  On October 20, 1893,
the following contract was entered into between Glick and
the bank:

*1. NEGOTIABLE INSTRUMENTS: accommodation notes: fraud: evidence.*

> For value received, I, George Glick, hereby assign,
> transfer and deliver to the First National Bank of Mar-
> shalltown, Iowa, sixty shares of $100.00 each of the cap-
> ital stock of the First National Bank of Marshalltown,
> Iowa, evidenced by stock certificate No. 59 of date October
> 17th, 1893.  I also hereby sell, assign, and transfer to
> the First National Bank of Marshalltown, Iowa, eight
> hundred and sixty-seven (867) shares of $100.00 each of
> the capital stock of the National Linseed Oil Company of
> Chicago, Illinois, and forty (40) shares of $100.00 each
> of the capital stock of the First National Bank of Mar-
> shalltown, Iowa, being the same 867 shares of the National
> Linseed Oil Company stock and the forty (40) shares of
> the stock of the First National Bank of Marshalltown,
> Iowa, which were assigned and delivered October 17th,
> 1893, by said George Glick to the First National Bank of
> Chicago, Illinois, as collateral security, or pledge, for the

payment of one note of $10,000 given by said Glick, on the date last aforesaid, and due ninety days after date and which stock is now held by said First National Bank of Chicago, Illinois.

I also assign and transfer and deliver to said First National Bank of Marshalltown, Iowa, a note of three hundred dollars given April 1st, 1893, by H. A. Robinson, due November 1st, 1893, without interest if paid when due. Said note being given to Glick and Steward.

All of the above-described stock and said note are transferred by said Glick to the First National Bank of Marshalltown, Iowa, as collateral security, and pledges, for the payment of the following described notes given to the First National Bank of Marshalltown, Iowa, and signed or indorsed by said George Glick, viz.:

| Date. | Maker. | Endorser. | When Due. | Amount. |
|-------|--------|-----------|-----------|---------|
| July 10, 1893 | Geo. Glick | No | On demand | $9,950 00 |
| July 10, 1893 | H. L. & Lot Co. Geo. Glick | Geo. Glick | On demand | 4,700 00 |
| July 26, 1893 | Jane Glick | Geo. Glick | On demand | 5,500 00 |
| July 1, 1893 | Fred E. Glick | Geo. Glick | On demand | 7,400 00 |
| Jan. 9, 1893 Interest paid to July 10, | C. J. Lander | Geo. Glick 1893. | On demand | 5,000 00 |
| Dec. 14, 1892 Interest paid to July 10, | Chas. Glick | Geo. Glick 1893. | On demand | 1,000 00 |
| July 9, 1892 Interest paid to July 10, | Chas. Glick | Geo. Glick 1893. | On demand | 5,000 00 |

It is further understood and agreed between the parties hereto that the assignment of said 867 shares of National Linseed Oil Company stock, and the forty (40) shares of the capital stock of the First National Bank of Marshalltown, Iowa, is subject to all the rights of the First National Bank of Chicago, Illinois, as collateral to said ten thousand dollar note of said George Glick.

It is further agreed that the First National Bank of Marshalltown, Iowa, may sell and dispose of so much of said stock at either public or private sale and convert the same into money at the best obtainable prices, on ten days written notice to said George Glick as shall be necessary to pay said note of $10,000.00 now held by the First National Bank of Chicago, Illinois, and fully pay and satisfy all the

notes signed and endorsed by said Glick herein fully described and listed.

And of said stock unsold, or the proceeds thereof if sold, not necessary to pay Glick's indebtedness to the First National Bank of Marshalltown, Iowa, and said $10,000.00 note held by the First National Bank of Chicago, Illinois, shall be turned to said George Glick.

· On presentation of this assignment or on the written order of said George Glick, said First National Bank of Chicago, Illinois, is authorized to deliver and assign said stock to the First National Bank of Marshalltown, Iowa.

Marshalltown, Iowa, October 20, A. D., 1893.

Geo. Glick, First National Bank,
        Per J. P. Woodbury, V. Pres.
In presence of:
  J. F. Meeker.

This contract appears to have been entered into while J. P. Woodbury was vice president and just before he became president. On July 17, 1897, the following contract was entered into:

Marshalltown, Iowa, July 17, 1897. Whereas Dr. George Glick, being indebted to the First National Bank of Marshalltown, Iowa, in a total sum of $33,606.00 and past-due interest on the same, comprised in the following described notes, all dated July 1st, 1897, and payable to the First National Bank of Marshalltown, Iowa, on demand, with 8 percent interest from date: One note signed Holland Land & Lot Co. for $4,700. One note signed F. E. Glick, for $5,300. One note signed Geo. Glick, for $9,264. One note signed F. E. Glick, for $3,342. One note signed C. J. Lander, for $5,000. One note signed Chas. Glick, for $6,000. And whereas the said George Glick having deposited with the said First National Bank 867 shares of the National Linseed Oil Company stock as collateral security, it is hereby agreed and understood by said First National Bank, George Glick, F. J. Woodbury, and J. P. Woodbury, in consideration of the further security to the First National Bank of a portion of said indebtedness, by said F. J. Woodbury endorsing two of the above described notes, viz., the Holland Land & Lot Com-

pany note of $4,700, and the note signed by F. E. Glick of $5,300, being in amount $10,000, that the said National Linseed Oil stock is to first cover as security the note signed by George Glick for $9,264 and the note signed by F. E. Glick for $3,342, and secondly, this collateral is to secure the two notes signed by the Holland Land & Lot Co. for $4,700, and one signed by F. E. Glick for $5,300, both of same being endorsed by F. J. Woodbury, and thirdly, this same collateral security is to cover the note signed by C. J. Lander of $5,000 and the one signed by Chas. Glick for $6,000. That is, that when the said 867 shares of National Linseed Oil stock are sold to liquidate the above indebtedness of George Glick to said bank, the proceeds of same is to be first applied in paying off the note signed by George Glick for $9,264, and the one signed by F. E. Glick for $3,342 and after this any remainder shall be applied in paying off the Holland Land & Lot Co. note of $4,700, and the note signed by F. E. Glick, for $5,300, and after these have all been paid, any further remainder shall be applied in paying off the note of $5,000 signed by C. J. Lander and the note of $6,000 signed by Chas. Glick. And it is further then agreed and understood that this agreement is to hold good on the above described notes and all renewals of the same. It is further agreed and understood that in case any loss should occur to the said F. J. Woodbury by his endorsement of the two described notes above, that the said J. P. Woodbury is to share the same equally with the said F. J. Woodbury. And it is further agreed and understood between the parties hereto that in case any loss to said F. J. Woodbury and J. P. Woodbury should occur to them by their guaranteeing the two notes above described amounting together to $10,000 that they are to be protected and reimbursed in the same by proceeds of the sale of a certain policy of life insurance for $10,000 on the life of one Charles Holmdale, now owned by said First National Bank. [Signed] George Glick. J. P. Woodbury. F. J. Woodbury.

The collateral described in these contracts was all disposed of. Only George Glick was ever consulted by the bank officers either as to the disposition of the collateral

or as to the application of the proceeds of it. The failure to account for the collateral is one of the defenses set up by the accommodation note makers. We do not now go into that question. We only refer to the fact above stated as a circumstance tending to indicate the mutual attitude of the bank officers and of George Glick as tending to show that the indebtedness referred to was that of Glick alone. The bank officers do not seem to have assumed toward the note makers anything more than a mere formal relation at any time. The notes were regularly renewed in order to avoid any appearance of dishonor. But in the whole period of fifteen years of such renewals no request was ever made of such makers for the payment of a dollar either of principal or interest. Neither was interest included by computation in the renewal notes; the new notes always being drawn for the same amount as the old. It is claimed for the plaintiff that the interest on these notes was remitted as a matter of favor to George Glick on the theory that he had given much service to the bank, and that it was beyond his ability to pay more than the principal sum. This circumstance also has its significance as indicating that George Glick was the debtor to whom the bank was looking for payment. That this was also the attitude of George Glick himself is clear from the testimony. The significance of this circumstance is somewhat emphasized by the fact that about July 17, 1897, George Glick ceased even the formality of indorsing the accommodation notes. He continued, however, for many years thereafter to make payments upon his debt, and these payments appear to have been credited in some manner upon the debt as such, but no credits were ever actually entered upon the accommodation notes. J. P. Woodbury is the only one of those connected with the transactions who has testified on behalf of the plaintiff. Although he claims that the notes in question were accepted by the bank in lieu of the obligation of George Glick somewhat as a legal

conclusion, yet he has testified with commendable candor as to the facts involved and as to the purpose to be accomplished by the accommodation notes. We quote the following excerpts from his testimony:

The indebtedness of Dr. Glick to the bank was evidenced by promissory notes carried in his own name individually for the amount of $10,000 and less, and in other names. A division of this indebtedness was made among other parties who gave the notes from time to time. They had been made, as I said before, before I came there and assumed the presidency of the bank, and I found this indebtedness at that time. It was carried in his own name up to the amount of $10,000 and less, and in other names up to $10,000 or less. The sum total of the indebtedness was between $40,000 and $50,000 at the time . . . The notes of C. J. Lander and Charles Glick were made to comply with the law. The United States statute prohibits a national bank from loaning direct to any one customer more than $10,000 of its capital and it was divided up, and notes were given by his friends and relatives to carry it in their own names in which they assume the responsibility of the debt. Part of the time the notes were indorsed by Dr. Glick, and after that they were not so indorsed. This was done by request of Mr. Fletcher, the cashier, who is a son-in-law of Dr. Glick, and for that reason it made the indebtedness as indorser to the bank so large that the examiner found fault with it. . . . The bank took the notes of Charles Glick, F. E. Glick, and C. J. Lander as they would any papers over its counter. The indebtedness had been made, and it had to be carried, and it was carried in the way I have stated in my previous statement to conform to the law. In taking the renewals of these notes, the interest had been paid up to the time until my assumption of the presidency. No interest has been paid on these notes since that time. We found that the loan was so heavy for Dr. Glick and we sympathized with him, as he had been connected with the bank for so many years and one of its founders, that we would remit the interest to him so as not to increase the burden any more. That was done by a majority of the stockholders and my brother and myself. Through our sym-

pathy to Dr. Glick we remitted the interest to the signers
of these notes, C. J. Lander, F. E. Glick, as we felt that
we did not want to distress them, as they were relatives
and friends of the doctor, and no interest was collected
at all after the time Dr. Glick retired as president of the
bank. . . . I had a conversation with C. J. Lander,
one of the makers of these notes. He called me into his
store one day, and wanted to know about it. This was two
or three years previous to my withdrawal from the bank
—in 1904 or 1905 I think. I told him the indebtedness was
being reduced gradually in a small way, it was not being
increased, and that we were remitting the interest. . . .
Mr. Lander objected to the renewals of the loans. Mr.
Fletcher had hard work to get him to sign, and he called
me in to talk with him about it. After he talked with
me, he signed the note for Mr. Fletcher. This was the
note previous to the last one that he signed. I told him the
debt was not being increased. It had been reduced quite
a little by the doctor's salary. The doctor had a fine
salary for a while, and used all surplus savings in reduc-
ing the notes. Made a good many payments of $500 each
I think. . . . I had one conversation with Charles
Lander about the Glick indebtedness, and in that I told
him that the indebtedness was being reduced, that we were
not adding to it by adding the interest to the principal.
I meant the whole George Glick indebtedness. . . .
We felt that George Glick was doing the best he could
under the circumstances, and reducing this indebtedness
in a small way and as fast as he could. I think that was
one of the reasons that the bank was not making demands
upon the defendants for payment, but were renewing the
notes. . . . It is a common bank custom, and was
with the First National Bank, to carry loans of persons
where they exceed $10,000 in the name of other people.
I did that myself. . . . This was known in the bank
as the George Glick paper, and was carried for this term
of years without interest. George Glick was one of the
founders of the bank, and we had a great deal of feeling
and sympathy for Dr. Glick. We recognized the law that
we could not carry in any one name over $10,000. For
that reason the debt was put in the form I have just
stated. . . . F. E. Glick was a son of George Glick

with no means and no property of any kind that I knew of. His name was used to carry the debt of George Glick in same manner as the others. George Glick's debt was put in the name of F. E. Glick. By the contract it was a method of complying with the law by cutting up George Glick's debt so that it would come under $10,000.

It is a circumstance of some significance that the Woodbury's themselves became accommodation makers of notes to the bank, which were intended only as a cover to conceal a part of the Glick indebtedness. Such notes were executed to the bank as payee and signed by F. J. Woodbury alone. F. J. Woodbury as signer, however, was protected by the agreement of his brother J. P. Woodbury to share with him any loss that might result to him thereby, and both parties were protected by an agreement or understanding with the other officers of the bank that they should be held harmless against payment of the notes. It will be noted from portions of the record which we have already quoted that Glick owed $10,000 to a Chicago bank which was secured by collateral. This debt was paid by the Bank of Marshalltown. Such payment was covered by the note or notes of F. J. Woodbury above referred to, and such note was made to appear upon the books of the bank as one of its regular assets. This transaction was explained by the plaintiff as a witness in the case as follows:

The Marshalltown bank took up a $10,000 loan which George Glick owed the Chicago bank. Then it became a debt from George Glick to the Marshalltown bank. F. J. Woodbury's note took up the debt of George Glick to the Marshalltown bank. It didn't become a debt to F. J. Woodbury from the fact that F. J. and J. P. Woodbury were together on that deal, but it was carried in F. J. Woodbury's name. It was supposed to be the bank. It was still indebtedness to the First National Bank of Marshalltown as far as that was concerned. According to the bank records, it was a debt that F. J. Woodbury owed to the bank. Father was simply representing the bank in that the collateral was put up. It was done to keep the

bank examiner off. That is the fact of the matter as far as that is concerned. It was to secure the debt in the name of somebody else to prevent the bank examiners finding out there was an excess loan. . . . They did that in order to take care of this Glick paper which had been paid by the Marshalltown bank, and it was still carrying Dr. Glick for that amount and this was to take care of that amount. They gave a note for $15,000 so that on the records of the bank it would appear that the Woodburys were debtors to the bank and George Glick was not to that extent. That $15,000 stock transaction which took place along about 1896 is a separate transaction from the indorsement by F. J. Woodbury of certain notes that took place on July 17, 1897. That was a subsequent arrangement. The matter then again got into such shape that the comptroller was after them.

Some light is thrown upon the bank's method with reference to the "Glick indebtedness" in a letter from the cashier of the bank to the plaintiff herein: "Sept. 26, 1899. My dear Frank: I hand you herewith renewal notes for your father's and George's signatures which please have signed and returned as soon as possible. You will remember that it was necessary to arrange the Glick indebtedness in this way when they were firing examiners at us a few years ago. Your father is protected by the Glick Bank Stock which is easily worth the notes, and also a stipulation from the bank holding him harmless for signing. Kindly give this your prompt attention and oblige, Very truly yours, T. J. Fletcher, Cashier." The note of the Holland Lot & Land Company bears date March 3, 1907. The signature of the company purports to be made by George Glick as president. As already indicated, this corporation was not only insolvent, but it had been dissolved by order of the court nearly thirteen years before. The note was a mere form, and was understood between the parties in interest to represent a part of George Glick's indebtedness. For the payment of it the bank looked to George Glick alone, although his liability therefor did not

in any manner appear upon the paper itself. We mention this only as a collateral circumstance. It is consistent with the theory that the substantial identity of the George Glick indebtedness was never lost within the understanding of the parties, but that it was carried in a fictitious form for the purpose of avoiding disclosure to the bank inspector. It is a circumstance also in favor of the defendants, although not a conclusive one, that the original notes as well as all subsequent renewals were made to the bank itself as payee, and not to George Glick. On its face, therefore, the contract of the maker was with the bank as such. It is undisputed that the notes were accommodation notes. The only dispute at this point is whether the party accommodated was George Glick or the bank. The fact that the bank was the payee is a circumstance in favor of the claim that it was the accommodated party. This is emphasized by the fact that Glick was insolvent, and had turned over to the bank all his property. Personally he could have nothing to gain nor purpose to subserve by transferring his liability to new and unsecured creditors. On the other hand, the situation of the bank as such was extremely critical, and its officers were under the pressure of temptation to tide over the day of difficulty and to strive for time of grace which could be obtained only by concealing its true condition. The fact that this paper could have been carried for fifteen years without request of payment and without claim of interest is inconsistent with any other theory than that the bank officers at all times deemed such notes as accommodation paper as between them and the makers thereof.

We are convinced that no other fair conclusion can be reached upon this record than that the notes were executed and delivered as accommodation paper, and that the bank must be deemed a party accommodated. This conclusion does not forbid a finding that George Glick also was a party accommodated. He and the other managing

officers were joint wrongdoers in the scheme adopted. This fact of itself would forbid that any of the parties thereto should profit thereby by the aid of the court.

It may be noted here that in 1907 the Woodburys sold their bank stock, and the management of the bank passed into other hands. The assets now under consideration were rejected by the new management and an assignment was executed of all the right, title, and interest of the bank thereto to the plaintiff as trustee for the beneficiaries already named. He does not claim to be a holder in due course. His right to recover is no better than that of his assignor. Neither are the rights of creditors or depositors of the bank involved in any manner. In reaching a conclusion on the facts, we have placed much reliance upon the long course of dealing of the bank with reference to this paper. As to just what was said when the first note of each maker was signed, the evidence is very meager. Very little was said. George Glick was president of the bank at that time, as well as its debtor. We would be slow to hold that he was acting for the bank in such transaction were it not for the subsequent conduct of all the bank officers after the retirement of Glick.

2. SAME: assignments: *bona fide* holder: recovery.

In view of our conclusion at this point, we have no occasion to deal with the multitude of other questions which have been discussed by counsel. The case is ruled in this respect by *First National Bank v. Felt,* 100 Iowa, 680. The scheme herein disclosed was one to be severely condemned. It might have resulted naturally in disaster to the innocent, and in penal calamity to the actors in it. We are advised in the argument of counsel that pending this litigation both beneficiaries of the trustee plaintiff and the defendant George Glick, and his wife, Jane Glick, have all died. In view of this fact and of the further fact that no depositor or creditor was permitted to suffer, we refrain from further comment on this particular subject. It may

be said for Glick that he never repudiated his liability for the debt, and that to the end he devoted all his waning energies to its liquidation. And it may be said for the Woodburys that, though they sustained a great loss by this indebtedness, they dealt with their debtor at all times with commendable consideration.

II. The defendants have taken a cross-appeal. The plaintiff made a number of parties defendant who do not appear to have any interest in the controversy as it finally

3. JUDGMENTS: conformity to issues.

developed. The plaintiff at the trial withdrew all claim as against any of the defendants except the defendants Charles Glick, F. E. Glick, and C. J. Lander. All the defendants, however, have joined in a cross-bill against the plaintiff. They asked in such cross-bill that the plaintiff be required to deliver to them a certain policy of insurance upon the life of Jane Glick. Jane Glick was not a party to the suit. No facts were pleaded which disclosed any right of possession in the defendants. The plaintiff at the trial disclaimed all interest in such policy and in such insurance. The trial court in entering a decree for the defendants ignored this prayer of their cross-bill. We think that the defendants have no grievance at this point.

The defendants Charles and F. E. Glick and Lander also prayed that they recover possession of their notes, and that the same be delivered up for cancellation, and that

4. SAME: cancellation of instruments.

the plaintiff be enjoined from transferring the same. This prayer was also ignored in the decree of the trial court. The relief so prayed by these defendants was purely formal. The decree of the trial court dismissing the petition was of itself an adjudication which would bar future action by plaintiff on the notes. This of itself was a cancellation. Such adjudication could not be avoided by transfer of the notes to third parties because they were already past due. They were also produced in evidence and became part of this

record.  It is manifest therefore that the defendants have no grievance at this point.  It is our conclusion that the decree of the trial court should be affirmed on both appeals —*Affirmed.*