D. W. SMOUSE, Appellee, v. WATERLOO SAVINGS BANK, Appellant.

**BILLS AND NOTES:** Accommodation Paper—Who is Accommodated
1  **Party?** The payee of an accommodation note is not necessarily the party accommodated—is not necessarily the party to whom the maker was "lending his name." Record held to show that a party who obtained an accommodation note payable to a bank, and delivered it to the bank and *obtained full credit therefor,* was the accommodated party, and not the bank.

**BILLS AND NOTES:** Accommodation Paper—Equitable Action to
2  **Cancel.** Negotiable promissory notes executed to a bank, without any consideration passing to the maker, and executed solely to enable the bank to obviate the objection that it was making excess loans to individual borrowers, constitute accommodation paper, and

may be canceled by proper action in court, it appearing that the execution of said paper did not result in the bank's surrendering any of its assets.

*Appeal from Black Hawk District Court.*—G. W. WOOD, Judge.

JUNE 28, 1924.

ACTION in equity, to cancel certain notes in the possession of the defendant, on the ground that said notes were without consideration and were accommodation notes. A decree was rendered as prayed in plaintiff's petition, and the defendant appeals.—*Affirmed.*

*Edwards, Longley, Ransier & Harris,* for appellant.

*Clark & Byers, J. H. Jamison, Carr, Cox, Evans & Riley,* and *Mears & Lovejoy,* for appellee.

FAVILLE, J.—Two sets of notes are involved in this litigation. One set consists of two notes of $5,000 each, dated November 29, 1915. The other set involved seven notes of $5,000 each, dated January 23, 1922. By way of counterclaim, appellant asked judgment against appellee on all of said notes.

Appellant is an Iowa corporation, with a capital of $100,000. It was incorporated in 1902. One Logan was cashier until June, 1917, when he became president, and had active management of the bank. The bank did an extensive business, having deposits of two million dollars at one time.

The Conservative Land Company is a corporation, owning a large amount of real estate in North Dakota, which was substantially incumbered. Logan was interested in this company, and, as we understand the record, held all of the stock of the company after 1921.

Appellee is Logan's uncle, and these parties are on intimate terms.

The Conservative Land Company was a heavy borrower at appellant bank.

We first consider the set of two notes of $5,000 each, dated

November 22, 1915. The record in regard to these notes is meager and quite unsatisfactory. The notes were each payable on demand, and bore interest at six per cent, payable semiannually, and the appellant bank was named as payee. The interest appears to have been indorsed on these notes at semiannual intervals for a period of six years, but it does not appear that any of this interest was paid by appellee.

Appellee testified regarding these notes:

"In 1915 he told me that that land company—that Conservative Land Company—had rather an excess loan or something,—what was said,—no, let's see—what was it—said that there was some land company paper that he wanted to take out of the bank; and I gave them to enable him to take these notes out."

Logan testified that the substance of the arrangement between him and appellee was that appellee would not have to pay these notes, and that he never did pay the notes or the interest on them. He also testified:

"* * * it certainly was applied on the Conservative Land Company proposition some way or another, possibly took up notes. I do not know how much the Conservative Land Company owed the Waterloo Savings Bank at the time. My recollection is that it owed some notes, but I don't know how much— I have no record to go by. My recollection would be that the $10,000 took up notes."

The records of the bank show that, on November 29, 1915, the account of the Conservative Land Company in appellant bank was overdrawn $286.60. On that date, the land company was credited with a deposit designated as "D. W. Smouse, $10,000," on the books of the bank.

It also appears that on that day the land company drew a check on its account in the bank for $9,667.22. This is shown by the stub of the check book of the land company. The check appears to have been given to appellant bank to pay a note of $9,200, and interest, $467.22. The balance appears to have been checked out by the land company.

The notes in suit were carried as bills receivable of the bank thereafter, and are still among its assets.

In regard to the seven notes of appellee of $5,000 each, it appears that said notes were all dated January 23, 1922, and were made payable to appellee and indorsed by him in blank. These notes were all due August 15, 1922. The history respecting this transaction appears to be, in general, as follows:

On December 30, 1919, the land company gave its note to appellant for $5,000, due on demand. On December 26, 1920, the land company gave to the bank two further notes of $5,000 each, due April 26, 1921, making a total of $15,000 in this group of notes. On March 11, 1921, Logan took these three notes from the note case of appellant bank and charged them against the savings accounts of Mr. and Mrs. Caward. This was done without the knowledge or consent of the Cawards.

On December 16, 1921, $8,000 more of the land company notes were handled in the same manner, the account of A. H. Caward being charged with the amount. The notes were all taken out of the bills receivable account at the time. Notes of other parties, amounting to many thousands of dollars, were also placed in the open accounts of the Cawards and carried in this manner.

On December 30, 1921, the notes that had been placed in these accounts were charged back to bills receivable, and the accounts properly credited; but the notes were not listed on the note register nor put in the note case, but were kept by Logan in his desk.

It does not appear that any of the other officers or directors of the bank, except the note teller, knew of these manipulations of the records of the bank by Logan. This method was adopted to prevent the bank from carrying excess loans to individual borrowers, its conduct in that regard having been disapproved by the banking department.

This situation as to these notes continued until January 23, 1922, a period of about three weeks.

It also appears that at this time the bank had other notes given by the land company, aggregating some $29,000. The total notes of the land company were in excess of the limit permitted to be loaned to one borrower.

Early in January, 1922, Logan wrote appellee that he antic-

ipated that the bank would be examined in a few days, and
later went to Des Moines to see appellee. A few days there-
after, appellee went to Waterloo, and had an interview with
Logan. He testified that at that time Logan told him that:

"The bank was expecting the bank to be examined in a
few days, and he wanted this paper to take the place of some
land paper that the examiner wouldn't pass. * * * The paper
was merely mentioned, that it was considered by the examiner
an excessive line. Logan said I wouldn't have to pay them. I
signed them there in the bank, and did not receive any consid-
eration, money or notes, for them."

He also testified:

"I never talked with any other officer or director about
these notes at all. These notes, my $35,000, in January, were
to take up notes of the Conservative Land Company. * * * He
said there were some of the land company notes there that would
be taken out, and he wanted my notes to replace them. I con-
sented to that, and thereupon executed these seven notes."

Logan testified to similar effect, and also that he told ap-
pellee that he would not have to pay the notes.

Appellee signed the notes that had been sent to him by
Logan, at Waterloo, and left them with Logan. This happened
on Sunday, January 22d; but the notes were dated the 23d.
The bank examiner arrived January 24th, and on that day
Logan gave the seven notes of appellee to the discount teller, to-
gether with other notes, making a total of $143,463.35. These
were run on the note register of the bank at the time, as we
gather from the record, but were not put in the note case. Of
the notes so turned over at that time by Logan, eleven, aggre-
gating $93,300, were Logan's own notes. Logan's explanation
is that he put in the $35,000 notes of appellee and his own notes
of $93,300 to take the place of the notes of the land company
and other parties which had been carried in accounts of the
Cawards and which had not been returned to the note case.

The evidence shows that the discount teller discovered that
the total amount of the notes so turned over by Logan exceeded
the amount required to make up the shortage in the note case,
by $11,000. The note teller reported this to Logan, who there-

upon took out three of the land company's notes that were then in bills receivable, which aggregated $11,000. He kept these three notes in his desk also.

The bank examiner discovered that the books called for $143,463.35 more notes than there were actual notes on hand in the note case. When this situation was made known to Logan, he produced the $35,000 of appellee's notes which had been previously given the note teller, and also his own notes for $93,300, and certain notes from other parties, all of which he had in his desk, aggregating said sum of $143,463.35, and turned them over to the bank examiner. He also produced the notes of $11,000 which he had taken out in the manner described, and also produced the original notes that had been in the Caward accounts. The bank examiner took all of these notes, and placed the $143,463.35 of notes in one sealed envelope and the $11,000 notes in another, and both packages were placed in the bank vault and remained there until produced in court upon the trial of this case.

It also appears from the cross-examination of appellee that, at the time Logan sent appellee the $35,000 of notes, with the request that he sign them, he also sent appellee notes of the land company to the amount of $35,000, payable to appellee. These latter notes did not belong to the bank, but were "new paper," made up by Logan for the purpose. When appellee came to Waterloo on the trip, at which time he signed the $35,000 notes in suit, he left these land company notes in Des Moines. What further was done with them does not appear in the record.

We have only attempted to present an outline of the general facts essential to an understanding of the matters involved for our determination. The evidence is quite voluminous. It is appellee's contention that he is an accommodation maker of both sets of notes involved in this suit.

Code Supplement, 1913, Section 3060-a29, is as follows:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time

of taking the instrument knew him to be only an accommodation party.''

Does appellee come within this definition as an accommodation maker?

Four propositions confront us at this point: (1) Did appellee sign the notes without receiving value therefor; (2) did he sign them for the purpose of lending his name to some other person; (3) if appellee was an accommodation signer, to whom did he lend his name; and (4) if the notes are accommodation paper, is appellant a holder for value?

I. We first consider the two notes of $5,000 each, dated November 22, 1915.

As previously stated, these notes were made payable to the bank. They were payable on demand, and were 1. BILLS AND NOTES: accommodation paper: who is accommodated party? carried by the bank six years, without any attempt to collect from appellee, and with knowledge that the interest thereon was being paid regularly by the Conservative Land Company. Meager as is the evidence in regard to these notes, we are satisfied that appellee signed them without receiving value to himself therefor, and for the purpose of lending his name as an accommodation to some other person. Who was the accommodated party,—the bank or the land company?

The burden rested on appellee to establish his contention that these notes were executed as an accommodation to the appellant bank. The fact that he received no consideration therefor, and that the notes were made payable to the bank, tends to sustain his contention; but these facts are not conclusive on the question, and we must consider it in the light of all the evidence in the case. The fact that the notes were made payable to the bank is a strong circumstance in favor of the contention that the bank was the accommodated party. *Woodbury v. Glick*, 151 Iowa 648. Title would not pass to the bank except by legal delivery, however.

The presumption, if it be such, that the bank was the accommodated party, because the notes are made payable to it as payee, is certainly subject to rebuttal. True, the land company, if it owned the notes, could not have negotiated the same with-

out the indorsement of the payee; but that fact alone did not make the land company any the less the accommodated party, if it delivered the notes to the bank and received value therefor.

What was the situation of the parties?

There is no pretense from any source that the bank was under any necessity of reducing its loan to the land company. The loan was not excessive. No one was complaining of it. Logan was not the managing officer of the bank at that time. He was actively interested in the land company. The land company needed funds to meet its obligations. Logan, for the land company, as we read the record, arranged with appellee to accommodate the land company to the extent of $10,000 by use of his name. Logan prepared the notes for this purpose. He made them direct to the bank, where he expected to place them, and get credit for them. The fact that Logan was cashier of the bank did not change the character of the transaction.

About a week after appellee signed the notes, they were turned over to the bank by Logan. They were then for the first time assets of the bank. The land company took credit for the face value of the notes on open account. From that instant, the land company could do as it pleased with the proceeds so credited. A portion went to balance an overdraft it then had in the bank, part was withdrawn by check, to pay a note and interest thereon which it owed at the bank, and the balance was checked out later. We fail to see in this transaction any sufficient evidence that the bank was in any manner the accommodated party.

Another circumstance in the case is the fact that the land company paid the interest on these notes for six years. This, however, tends to establish that the land company was the accommodated party, rather than the bank. It continued to recognize the notes as its obligation, and thus that the accommodation had been extended to it.

Again, an accommodation party is liable to a holder for value, "notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party." Code Supplement, 1913, Section 3060-a29.

We think that, under the record, appellant was a holder for value, within this statute.

Appellant pleads that it took the notes in due course, in good faith, and for value, and without notice of any defect therein. The allegation is broad enough to cover the question of appellant's having paid value therefor, even though it knew that the maker was only an accommodation party.

The bank parted with value when it gave the land company credit for these notes at their face value, on its open account, which the land company could and did check out as it saw fit, in the ordinary course of business. Under such circumstances, the accommodation maker is liable to the bank, even though the latter knew, when it gave value by the credit to the land company, that appellee was only an accommodation party for the land company. See *Crum v. Emmett*, 197 Iowa 1160.

We fail to see how appellee can avoid liability to appellant, under the record in this case, on the two notes of November 22, 1915. It is not a case of novation. The land company, through Logan, simply obtained appellee's notes for its own accommodation. A week after the notes were executed, it turned in the notes so prepared, to the bank, and took credit therefor on its open account at the bank. It used the proceeds for its own purposes, and as it saw fit.

On the entire record, we are constrained to disagree with the conclusion of the learned trial court on this branch of the case. We think that appellee failed to establish that appellant was the accommodated party in the execution of these two notes. On the contrary, we are convinced from the record that the Conservative Land Company was the accommodated party, and that appellant is a holder for value of the said notes, and as such is entitled to recover thereon. Knowledge that the paper was accommodation paper would not defeat appellant of its right to recover thereon as such holder for value. Appellant was entitled to judgment for the amount due on these notes. Due credit should, of course, be made for the interest that has been paid, as of the proper dates.

II. As to the set of notes executed January 23, 1921, a different situation exists. These notes were unquestionably given for the sole purpose of replacing loans in the bank that

2. BILLS AND
NOTES: accom-
modation paper:
equitable action
to cancel.

were "excess loans." We have previously re-
ferred to the evidence in regard to the man-
ner in which these notes were handled. Logan
anticipated an immediate examination by the
bank examiner. He knew the condition of the loans in the bank.
He was thoroughly familiar with the manner in which these loans
had been manipulated through the Caward accounts. He also
knew that the banking department had protested against the
carrying of excessive loans by the bank. He went to appellee
for help in the situation for the benefit of the bank, and appellee
executed the seven notes of $5,000 each for the sole purpose of
accommodating the bank in the matter. The bank parted with
no value for these notes. The situation was the same after the
notes were given as before. In fact no one received any value
therefor. True, the record shows that Logan gave appellee new
notes of the land company for a like amount, but this was only a
part of the plan adopted by the parties to effectuate the scheme
to secure the accommodation for the bank. It was quite on a
par with the act of Logan in putting his own notes of $93,300
in the bank at that time. Appellant insists that in this trans-
action the Conservative Land Company, and not appellant, was
the accommodated party. We do not so construe the record.
The notes were given for the avowed purpose of assisting the
bank in making a showing to the examiner at the approaching
examination. The express intention between the parties at the
time was to accommodate the bank in the manner suggested.

Some claim is made for the manner in which the notes were
handled in the bank, and as to whether or not they legally
passed into the assets of the bank, and whether notes then in
the bank were "retired." ·

No notes then in the bank were canceled and surrendered
to the makers because of the use of appellee's notes. All the
notes were held in the bank by Logan in the manner described.
The status was not changed. We find nothing in the conduct
of appellee that estops him from asserting that the notes were
mere accommodation paper for the benefit of appellant.

The action of the bank in regard to the original notes in
its possession before the notes in suit were placed in the bank

is of some significance, as bearing on the question of whether it regarded the notes in suit as accommodation paper.

It obtained security from the Conservative Land Company on its notes to such an extent as the land company appeared able to furnish it. We have considered all the matters discussed by counsel as tending to show that the bank is entitled to recover on the notes against appellee.

We are convinced, upon the entire record, that the seven notes of $5,000 each were given by appellee to appellant solely as accommodation paper; that they were without consideration; and that the decree of the trial court in respect thereto was correct, and should be affirmed.

We reach the conclusion that, as to the two notes of $5,000 each, dated November 22, 1915, appellant was entitled to judgment against appellee on its counterclaim for the amount due thereon, proper credit being given for interest paid thereon. As to the seven notes of $5,000 each, dated January 23, 1921, the decree of the district court was correct.

A decree in accordance with this opinion may be presented to this court or entered in the trial court, as the parties may elect.

The costs in this court will be taxed equally to the parties.

It results that the decree of the district court is—*Affirmed.*

ARTHUR, C. J., PRESTON, STEVENS, DE GRAFF, and VERMILION, JJ., concur.

EVANS, J., takes no part.