[No. 2177.]

Murphy as Receiver of The Needles National Bank v. Gumaer.

1. **Bills and Notes—Accommodation Paper—National Banks—Receivers—Estoppel.**

Where a national bank had in violation of the national banking act loaned to one person more than one-tenth of its paid-in capital stock and a person executed his notes, one payable directly to the bank and others to payees who indorsed them and delivered them to the bank, which were credited upon the unauthorized loan thus reducing the loan to an amount within the statute, the maker is liable on such notes in the hands of a receiver of the bank, notwithstanding they were executed purely as a matter of accommodation to the borrower and notwithstanding said borrower may have owned nearly all the capital stock of said bank and had complete control thereof. Even though the bank knew the notes were accommodation paper and accepted them under conditions that would have precluded its recovery thereon, the notes having been executed for the pur-

pose of giving the bank the appearance of holding genuine and valid assets, the maker is estopped to say as against the creditors of the bank that they were other than what they appeared on their face to be.

*Appeal from the District Court of Arapahoe County.*

Messrs. Cranston, Pitkin & Moore, for appellant.

Messrs. Patterson, Richardson & Hawkins, for appellee.

Thomson, J.

In the latter part of 1892 or early part of 1893, The Needles National Bank of Needles, California, was organized pursuant to the National Banking Act, with a capitalization of $50,000, and was opened for business in March, 1893. On the 15th day of May, 1893, A. R. Gumaer made his two negotiable promissory notes for $2,500, due sixty days after date, and payable, one to the order of The Gladiator Mining Company, and the other to the order of The Needles National Bank; and on the 20th day of the same month he made his three additional negotiable promissory notes for $2,500 each, due sixty days after date, and payable respectively to The Nevada Southern Railway Company, The Needles Reduction Company, and Isaac E. Blake. The note to the bank was delivered to it and, before their maturity, the others were endorsed by the payees and delivered to it. When these notes matured, they were replaced by new notes given by Gumaer, for the same amount to the same payees, all payable on demand—those to The Gladiator Mining Company and The Needles Reduction Company on the 15th day of July, 1893, and those to The Needles National Bank, Isaac E. Blake and The Nevada Southern Railway Company, on the 20th day of July, 1893. All of these notes were immediately delivered to the bank and, except the one pay-

able to it, were endorsed by the respective payees. The original notes were surrendered to the maker. In December, 1894, the bank suspended payment, and Daniel Murphy, having been appointed its receiver by the comptroller of the currency, duly qualified as such, and entered upon the discharge of the duties of his office. On the 18th day of November, 1895, this action was brought by the receiver against Gumaer to recover the amount due on the notes.

The defense was that each of the notes was accommodation paper, given without consideration, and that neither the bank nor the plaintiff nor any one else ever acquired title to the notes or any of them as a *bona fide* holder for value. The verdict and judgment were for the defendant, and the plaintiff appealed.

The evidence disclosed the following facts: The stockholders of The Nevada Southern Railway Company, The Gladiator Mining Company, The Needles Reduction Company, and The Needles National Bank were nearly identical, and a majority of the stock in all of them was owned by Isaac E. Blake, who was also a director of the bank; the bank loaned to each of the corporations $5,000, which amount equaled one-tenth of its paid-up capital; the managers of the companies and also Mr. Blake made large overdrafts on their accounts, the exact amounts of which do not appear; the loans were not paid, and the officers of the bank wrote to Blake asking him to put some other paper in their possession, so that they would not appear to have extended credits beyond the limits of the National Banking Act. Mr. Blake then requested the execution by the defendant of the notes in question, acquainting him fully with the situation, and informing him that the companies had made overdrafts on the bank, and secured discounts beyond the limits fixed by the National Banking Act, and that these

notes were wanted for the purpose of reducing the overdrafts; also saying to him that he, Blake, was the bank, that he owned ninety-five per cent. of the stock, that everything was run by himself, or as he might dictate; that the notes would be an accommodation to the bank and, therefore, to him, as the principal stockholder; that he, the defendant, would not be expected to pay them, and that when the bank did not require the notes longer for the purpose of representing the overdrafts, they would be returned. Upon the foregoing statements the defendant signed the notes as requested. After the bank accepted the notes it treated them as all its loan and discount paper was treated. They were entered the same as if cash had been paid; the overdrafts were extinguished to the extent of the face of the notes, and the notes were included in the reports to the comptroller of the currency, and laid before the national bank examiner when he investigated the condition of the bank. Some payments of interest were endorsed on the notes; the testimony was, however, that no money was paid, but that the cashier simply charged the amounts so endorsed to the accounts of the payees of the notes.

This case is here for the second time. Upon the former hearing this court reversed a judgment rendered by the trial court in favor of the defendant, on the ground of insufficiency of competent evidence to sustain it.—*Murphy v. Gumaer,* 12 Colo. App. 472.

At the second trial considerable new evidence was introduced, and evidence formerly held incompetent by this court, omitted. Very much of that now before us is the subject of attack by the plaintiff, but we do not deem it necessary to pass upon his objections. We have detailed none of this portion of the evidence, for in our view, it is immaterial; and, outside of it, upon principles to which it has no relation, the judgment should not be suffered to stand.

The position taken for the defendant is that Blake was the agent of the bank; that what he did in the way of procuring the notes was, in effect, done by the bank itself; and that the bank was, therefore, not an innocent purchaser for value, but was merely the temporary holder of notes given without consideration, under an agreement by which it was bound, that their collection would never be enforced. This theory is, in a considerable degree, deduced from the evidence to which we have just alluded, and which we have not otherwise noticed. But we may concede without restriction or qualification the existence of all the conditions which counsel find in the evidence, and still a judgment for the defendant does not result. Whatever relations Mr. Blake may have sustained to the bank, how completely soever it may have been subject to his control and bound by his acts, the concern was a national banking corporation, the management of which was regulated by the act of congress in pursuance of which it was organized. That act is Title 52 of the General Statutes of the United States. It provides that the total liabilities to the bank of any person, firm or corporation, for money borrowed, shall at no time exceed one-tenth of its capital stock actually paid in, but that the discount of commercial or business paper owned by the person negotiating the same shall not be considered as money loaned; it imposes upon the bank the duty of making and transmitting to the comptroller of the currency five reports during each year, verified by the oath or affirmation of its president or cashier, and attested by the signatures of at least three of its directors, each of such reports to exhibit the resources and liabilities of the bank on any past day by him specified, and exacts the publication of each report, as made to the comptroller, in some newspaper in the place where the bank is located, or if none be there, then in the

newspaper that is nearest; it provides for the appointment by the comptroller of a suitable person or persons to inspect the business of each bank, with power to make a thorough examination into all its affairs, and requires him to make to the comptroller a full and detailed report of its condition; and it provides that if the directors of any national banking association shall violate, or knowingly permit any of its officers, agents or servants, to violate, any of the provisions of the act, all of its rights and privileges shall be forfeited, the violation to be determined and adjudged in the proper court at the suit of the comptroller.

At the time the notes, of which those before us were renewals, were made, endorsed and delivered to the bank, the provision forbidding a loan to one person or corporation of an amount greater than one-tenth of the capital stock, had been violated. The next report to the comptroller by the bank, or the bank examiner, of its condition, would infallibly show that it had become liable to a forfeiture of its rights and privileges; and these notes were obtained and delivered to the bank for the express purpose of making it appear that the requirements of the provision had been observed. Accordingly, the overdrafts were extinguished to the extent of the face of the notes, and the notes were entered on the books as discount paper. To all appearances they were commercial paper, owned by the person negotiating them, and, therefore, not subject to the inhibition as to the amount which might be loaned to one person. To the bank examiner, when he should make his examination, to the comptroller, when he should receive the reports of the bank and of the examiner, and to the public when the bank's reports should be published, these notes would appear as *bona fide* assets of the bank.

Now, the defendant knew the exact purpose for which the notes were taken. He was advised that the payees of the notes had—to use his own language—"obtained overdrafts and had obtained a line of discount which was in excess of what the bank was able to loan them, and keep within the requirements of the banking law;" according to his testimony, he was also advised that his notes were wanted for the purpose of reducing the overdrafts; and, according to Mr. Blake, when he was requested to sign the notes, he received full information of the situation. The notes were used to give the bank an appearance of soundness, to prevent a suspicion to the contrary on the part of the bank examiner and the comptroller, and, through the published reports of the bank to the comptroller, to acquire the confidence of the public. It is true that no consideration moved to the defendant; but the overdrafts were extinguished on the books of the bank to the extent of the face of the notes, and the release of the bank's claim on account of the overdrafts was a sufficient consideration for the plaintiff's promise.

But it is said that there was no intention to release any claim of the bank on account of the overdrafts; that the entries by which they were apparently paid were made merely to give a better appearance to the bank's statements, but that when the overdrafts were paid, as they were expected to be, the notes were to be returned to the defendant. In other words, the contention is that the apparent release of the debts evidenced by the overdrafts, was fictitious; that while they appeared to be released, they were not in fact released; and that, therefore, the supposed release did not constitute a consideration for the notes. Conceding that the facts were as counsel states them, we are unable to see wherein they are of any avail to the defendant. We do not think he is in a position

to say that the books did not speak the truth. This controversy is not between the bank and the defendant. The suit was brought by the receiver, and he is a representative of the creditors of the bank; its assets constitute a trust fund in his hands for their benefit.—See *Riddle v. National Bank,* 27 Fed. 503; *Case v. Terrill,* 11 Wall. 199.

In accordance with the provisions of the National Banking Act, it is his duty to cause debts due to the bank to be collected, and its property to be sold, and, if necessary for the payment of the debts due from it, to enforce the individual liability of the shareholders. He pays over the money he receives to the treasurer of the United States, subject to the order of the comptroller; and the latter, after full provision has been made for refunding any deficiency in redeeming the notes of the bank, makes, from time to time, ratable dividends on the claims of creditors which have been proven; and what is left, if anything, is paid over to the shareholders.

That the bank had creditors, that it received deposits and did a general banking business, the evidence abundantly shows. The defendant was instrumental in clothing the bank with such an appearance of genuine assets as induced the comptroller to regard it as sound, and to suffer it to continue in business. In the reports which were transmitted to him, these notes figured as resources; and the public had a right to rely on the reports when they were published. If the defendant was not liable on the notes, the comptroller was deceived, and the persons who dealt with the bank and intrusted it with their money, were also deceived. However valid the defense might be if the bank were plaintiff, the defendant, who, when he gave the notes, knew exactly the purpose for which they were to be used, is estopped to say, as against the creditors, that they were other than what, on

their faces, they purported to be, or that the appearance which was given to the books was not genuine.

The plaintiff requested an instruction that under the law and evidence the jury should return a verdict in favor of the plaintiff for the amount due on the notes, and, this request being refused, asked an instruction that if the jury found from the evidence that the notes were given with the intention of having them appear on the books of the bank, and be included in the published statements of the bank, as valid assets, and that the notes were so used, the defendant was estopped to say that the notes were not valid, and were not intended to be paid, which was also refused. The latter request, in our opinion, correctly stated the law applicable to the case, but the proposed instruction was faulty in submitting to the jury a question upon which there was no conflict in the evidence. The only question which the case presented was one of law, and the instruction to find for the plaintiff the amount due upon the notes should have been given.

The judgment will be reversed with instruction to the trial court to enter judgment in the plaintiff's favor for the face of the notes with accrued interest, less any credits to which they may appear to be entitled.                                             *Reversed.*