Grafton,   }
April 6, 1926. }

### JOSEPH B. PERLEY *v.* MILTON N. WING, *Adm'r.*

While indorsers of a promissory note are *prima facie* liable in the order in which they indorse, evidence is admissible to show that as between themselves they have agreed otherwise.

In determining for whose benefit an accommodation was given, the test is, to whom was the credit in fact loaned.

Certain evidence held to be sufficient to warrant a finding that an accommodation indorsement was for the benefit of the makers of a note.

ASSUMPSIT, by the payee of a promissory note against the estate of an accommodation indorser. Trial by jury. Verdict for the plaintiff.

The note reads as follows:

"1949 $\frac{85}{100}$　　　　　　　　　　Lebanon, N. H., Aug. 1, 1919.

　　Six months after date I promise to pay to the
Order of J. B. Perley
Nineteen hundred forty-nine and 85/100 Dollars
Payable at Peoples Trust Company, Value received,
with interest.
No. 6254
Due Feb. 1　　　　　　　　　*C. Buffum*　　*A. J. Buffum.*"
Endorsements: J. B. Perley, N. L. Wing

The defendant's intestate was the above-named N. L. Wing. The court submitted to the jury the following special issue: "Did Mr. Wing sign the note for the accommodation of C. and A. J. Buffum?"

This question was answered by the jury in the affirmative. The defendant excepted to the denial of his motions for a nonsuit and for a directed verdict, and also to the submission of the above issue to the jury, upon the ground that there was no evidence to sustain an affirmative answer. Other facts appear in the opinion.

Transferred by *Sawyer*, J.

*John H. Noonan* and *Fred S. Wright*, for the plaintiff.

*David S. Conant* (of Vermont) and *Charles H. Hosford* (*Mr. Conant* orally), for the defendant.

BRANCH, J. The defendant concedes that his several exceptions raise only a single question of law, *i. e.*, whether there was any evidence from which it might be found that N. L. Wing indorsed the note for the accommodation of the makers. Both parties agree that this question is decisive of the case, and this appears to be correct, for the only other person for whose accommodation the note might have been signed was the plaintiff, and the law is well settled that the accommodation party is not liable to the party accommodated either at common law (8 C. J. 259, *s.* 409; *Woodward v. Bixby,* 68 N. H. 219), or under the negotiable instruments law. Laws 1909, *c.* 123, *s.* 64; 8 C. J. 260, *s.* 409; Brannan, Neg. Inst. Law (3d ed.) 243; *Goodman* v. *Gaull,* 244 Mass. 528.

The note in question was given for the purchase price of twenty cows sold by the plaintiff to the Buffums. The cows were shipped from Enfield to Derry, where the Buffums resided, in April, 1919. The note was subsequently sent to them for signature but lay in their house unsigned for several months. It was finally executed by them about August 1 and mailed to the plaintiff at Lebanon. He at once took it to the deceased, at Lyme, for his signature. The interview between them was very brief and was thus described by the plaintiff's wife, who was the only witness to testify upon this subject: "Mr. Perley got out of the car and told him the Buffum note had been returned, and Mr. Wing took the note and asked for a pencil, which I gave him. He signed his name on the back of that note. He handed it to Mr. Perley, and he handed it to me, and I took the note and the pencil both and put them in my pocketbook." In answer to the question "Whether or not you heard all that was said at that time," the witness replied, "Well, just the every-day things of life. We were in a hurry to get right along." Upon the

same day the plaintiff discounted the note at a bank. Payments aggregating $1,104.62 were made upon it by the Buffums, but it was not fully paid at maturity, and notice of dishonor was given by the bank to the plaintiff and by him to the deceased. The balance due was charged against the plaintiff's account. The deceased was the father-in-law of Arthur J. Buffum. He was well known to the plaintiff, with whom he had dealt in cattle. Neither of the Buffums had ever seen the plaintiff before the trial, and he had no knowledge of their financial standing. The Buffums claimed that the cows were unsatisfactory, (1) because too many were sent, and (2) because they were diseased.

The foregoing facts clearly appear from the testimony. As to the other questions which arise in the case, the evidence is quite as remarkable for what it does not show as for what it discloses. Although both Buffums were called as witnesses, they were not asked and it did not directly appear how the plaintiff happened to ship a considerable number of cows to them and allow them credit for nearly four months without security. Since neither of them saw Perley, it is plain that they must have acted through an agent. Who was that agent? Here again there is no direct testimony, but the testimony of Arthur J. Buffum was significant. Upon direct examination he stated that he had had "some business transactions with J. B. Perley," and then testified as follows: "Q. In connection with someone else? A. Yes, sir. Q. Who was the other person? A. Mr. Wing." Later, upon redirect examination in answer to the question, "What was the matter with them?" (the cows), he replied, "Well, I went up there to Mr. Wing's and I wanted eight or ten cows." From this testimony Wing's connection with the transaction at its inception seems clear, and it might be inferred that he negotiated the trade on behalf of the Buffums.

There was also evidence from which it might be found that it was a part of the sale agreement that Mr. Wing should indorse the Buffum note. Mrs. Perley testified, "I know he (Perley) wouldn't accept the note without Mr. Wing's signature." He "went up because he was to sign it. He knew he was to sign the note." Both of the Buffums stated that they did not ask Mr. Wing to indorse the note, but the existence of an agreement that he should sign it was indicated by the following testimony of Arthur J. Buffum: "I told him not to sign the note. I told him in letters written to him between those four months after the note was sent. After the cows were sent there the note came, two or three months afterwards,

and Mr. Perley wrote down and wanted to have the note signed. I think we wrote back to him that we wouldn't sign or something like that. I know I told the folks I wouldn't sign the note the way the cows were. So I wrote back to Mr. Wing not to sign the note, to have nothing to do with it." To this letter Mr. Wing made no reply.

Since the case is bare of direct testimony upon the question whether accommodation was given to the makers or the payee of the note, the jury was forced to decide this issue upon inferences from the circumstances under which the original contract was made and the note finally executed.

The defendant argues that the only legitimate conclusion to be drawn from the evidence is that the note was indorsed by Wing for the accommodation of Perley, and bases his argument upon the following evidentiary facts, which he says find support in the testimony: 1. That the note had not been signed by Wing when it was mailed to Perley. 2. That the Buffums did not ask Wing to sign the note. 3. That Perley actually obtained the signature of Wing. 4. That Perley needed Wing's signature to facilitate the discount of the note at the bank.

The last of these propositions finds no support in the testimony. While it is true that Perley did discount the note after Wing had indorsed it, there is not a particle of evidence that Perley's credit was not good at the bank or that the bank required Wing's indorsement, or any indorsement, before it would discount the note. This basis of argument is, therefore, not available for the defendant.

Since the existence of an agreement antedating the signing of the note by Wing was clearly indicated, it is plain that the significance of the other facts upon which the defendant relies must depend chiefly upon what the terms of that agreement were. If it were established that Perley agreed to sell the cows to the Buffums and accept their unsecured note in payment and that his subsequent application to Wing for an indorsement was an afterthought not contemplated by the original terms of the trade, then the defendant's argument would be difficult to answer, especially when considered in connection with s. 68 of the Negotiable Instruments Law (Laws 1909, c. 123, s. 68). This section provides as follows: "As respects one another, indorsers are liable *prima facie* in the order in which they indorse; but evidence is admissible to show that as between or among themselves they have agreed otherwise." Since Wing's indorsement appears below Perley's, he was *prima facie* not liable to Perley under the foregoing rule.

Under the second clause of the statute, however, the actual agreement between them was a question of fact, and the evidence falls far short of establishing conclusively any such agreement as the one above postulated. On the contrary, the jury might properly find that Arthur J. Buffum went to his father-in-law, Wing, for assistance in the purchase of some cows; that Wing negotiated the sale from Perley to the Buffums, and as a part of the trade, agreed to reinforce the credit of his daughter's husband, which was an unknown quantity to Perley, by indorsing the Buffums' note; that Wing acted throughout as the agent and for the benefit of the Buffums; that the subsequent indorsement of the note was in accordance with this agreement, and hence, that the accommodation was extended to the Buffums.

Under these circumstances the character of the transaction as an accommodation to the Buffums would not be changed if, in addition to the fact that they did not ask Wing to sign the note, it had appeared that the plaintiff did make the request (*Thom* v. *Kibbee,* 62 N. J. L. 573; *Lockwood* v. *Twitchell,* 146 Mass. 623) and that they were ignorant of the agreement (*Neal* v. *Wilson,* 213 Mass. 336; *Skagit Bank* v. *Moody,* 86 Wash. 286), for in determining who is the accommodated party the inquiry always is: To whom did the accommodation party loan his credit as a matter of fact? 8 C. J. 254, s. 401; *Rea* v. *McDonald,* 68 Minn. 187.

In *Neal* v. *Wilson, supra,* the precise point raised by the defendant in this case was dealt with by the court as follows: "We understand the defendant's contention . . . to be that on his testimony the jury were warranted in finding that the check here sued on was given at the request of the cashier of the bank and not at the request of Pearson, who was in New Hampshire at the time, and that if the jury so found, the plaintiff and not Pearson was the 'party accommodated.' . . . But even if the note was given at the cashier's solicitation it was confessedly given to be passed to the credit of Pearson's overdrawn account in order to make the account whole. That is to say, it was given for the accommodation of Pearson, who was the debtor, and not for the accommodation of the bank, which was the creditor."

In the present case, however, it is a legitimate inference from the testimony of Arthur J. Buffum, above quoted, that he and his brother knew the terms of the agreement and were willing to accept Wing's accommodation. Their subsequent letter to Wing telling him not to sign the note did not alter the character of his act as

an accommodation to them. The jury may well have found, as argued by the plaintiff, that "having gotten possession of the cows, they sought to induce the man who had promised to sign for their accommodation to refuse to do it, to the injury of Perley." If Wing's oral promise to indorse the note could not have been enforced, because it was a promise to answer for the debt or default of another within the meaning of the statute of frauds (8 C. J. 258, s. 404), he was none the less in honor bound to carry out his agreement, and in doing so, he loaned his credit to the Buffums just as effectively as though their letter had not been written.

The case of *Goodman* v. *Gaull, supra,* upon which the defendant strongly relies, differs essentially from the one at bar. In that case the plaintiff's own testimony demonstrated not only that he finally secured the signature of the defendant but that he, and he alone, conducted the preliminary negotiations which resulted in the defendant's agreement to sign. In the present case it does not clearly appear who conducted the preliminary negotiations, but, as pointed out above, it might be found that the arrangement was made by Wing himself for the benefit of his son-in-law. Furthermore, in the Massachusetts case the court said, "It does not appear that Bean [the maker] had solicited the defendant's indorsement, or had requested or authorized the plaintiff to obtain it, or that it was understood between the maker and the payee that the note . . . was not to become a completed instrument until the defendant's signature had been attached." In the present case, upon the facts above set forth, it might be found that the Buffums did authorize the plaintiff to obtain Wing's signature in accordance with a previous understanding that the note would not be accepted as a completed instrument without it.

The case was clearly for the jury, and the order must therefore be

*Exceptions overruled.*

All concurred.