IGLEHART ET AL. *v.* TODD ET AL.*

SAME *v.* APPEL ET AL.

SAME *v.* MILLIKAN ET AL.

[Nos. 26,138, 26,139, 26,140.   Filed December 8, 1931.   Rehearing denied April 1, 1932.]

* Note XLV Harvard L. Rev. 926.

428

*Frank B. Ross, Norman E. Patrick, Frederick E. Matson, James A. Ross, Robert D. McCord, Austin V. Clifford, Adolph Schreiber* and *Harry T. Ice,* for appellants.

*F. Winter, D. E. Watson, J. W. Fesler, Harvey J. Elam, Howard S. Young, Irving M. Fauvre* and *Ewbank & Dowden,* for appellees.

MARTIN, J.—The appellants are receivers, appointed by the probate court of Marion County, of The J. F. Wild & Co., a bank incorporated under the laws of the State of Indiana (hereinafter referred to as "the bank" or "the Wild bank"). Among the assets of the bank coming into the hands of the receivers were three promissory notes, payable to the order of the bank, one for $25,000 executed by Robert I. Todd, one for $25,000 executed by John J. Appel, and one for $50,000 executed by Frank M. Millikan. These three actions were brought by Todd, Appel and Millikan against the receivers, each alleging that his note was executed without consideration and solely for the accommodation of the Wild bank

and asking that the receiver be enjoined from asserting the same to be valid and enforceable and for the surrender and cancellation thereof. Subsequently, upon maturity of the notes, appellants by cross-complaints sought recovery thereon. Todd died before the trial and Appel died before judgment and their legal representatives were substituted as parties.

The causes were tried simultaneously by the court and judgments were rendered in favor of the several plaintiffs (appellees) and against the cross-complainants (appellants). From these judgments, the receivers of the bank have appealed, and the three appeals have been consolidated for briefing and decision, the issues, facts and questions of law involved in each being substantially the same. The error assigned is that the court erred in overruling appellants' motion for a new trial, wherein it is alleged that the decision is not sustained by sufficient evidence and is contrary to law, and that the court erred in admitting and refusing to admit certain evidence.

Briefly stated, the evidence shows the following undisputed facts: In November 1926, Liberty bonds in the amount of $271,000 were stolen from the Wild bank at Indianapolis. Two or three weeks thereafter (November 29-December 3), an examination of the bank was made by the state banking department, which revealed a shortage—an impairment of capital—of about $80,000. (The capital stock was only $100,000, while the deposits were about $5,000,000.) The bank commissioner thereupon told Mr. J. F. Wild, the president of the bank, and his associates that it would be necessary for them to levy a 100 per cent assessment, or that there would be required $100,000 in money (to guarantee the impairment).

Mr. Wild informed the bank commissioner that the question of increasing the capital stock was under con-

sideration, but probably could not be accomplished before a period of 10 to 30 days; that he had some influential friends who had plenty of wealth and would respond to any request he would make. The commissioner required (as the condition upon which the bank be allowed to continue operation) that Government bonds or high grade securities worth at least $100,000 be delivered to him to hold and that then the matter could rest until the new stock could, in the near future, be subscribed. Mr. Wild named Frank M. Millikan as one man from whom he expected to obtain bonds or money to deliver to the bank commissioner.

Mr. E. C. Fisher, vice-president of the Wild bank, had called on Mr. Millikan in his office on December 1, 1926, and asked him to subscribe for some capital stock in the Wild bank. Millikan, who had been president of the Columbia National Bank, vice-president of the National City Bank, and director of the Irvington State Bank and the Farmers Trust Company, told Fisher he was not in position to do so and was not anxious to become a stockholder in any bank, due to unpleasantness he had gone through in the past in banking circles, but said: "If I can be of any assistance to you or can help you I will be glad to have you call on me." Fisher told Wild of this. On December 9, Fisher telephoned Millikan to come to the bank as Wild wanted to see him. Millikan came and Wild asked him if he (Millikan) would give him (Wild) accommodation paper for $50,000 temporarily, while he could get his stock subscribed. Wild did not tell Millikan what he was going to do with the note and Millikan did not ask him. Millikan said he did not want to give anything that would be a liability that he would have to pay, and Wild said there would not be any liability on it. Wild said that Mr. John J. Appel and Mr. Robert I. Todd would give him similar paper and Millikan signed the $50,000 note

payable to the order of the bank without any further conversation. Millikan knew about the bond theft from the Wild bank, from what he had read in the newspapers. He owed the Wild bank more than $100,000 (secured by collateral) at the time he signed the accommodation note for $50,000, and he owed the bank more than $100,000 at the time of its failure, exclusive of the note in litigation.

Mr. Wild, on the same date, saw Mr. Todd and asked him if he would sign a note for $25,000. Todd said he would, signed the note, made payable to the order of the bank, and gave it to Wild who delivered it to the bank. Wild did not tell Todd about the examination of the bank a few days previous. Todd did not ask Wild what the note was to be used for and Wild did not tell him what the bank was going to do with it. Wild made no promises to Todd.

Mr. Wild, on the same day, called Mr. Appel on the telephone and told him that Mr. Millikan was going to sign a note for $50,000, that Mr. Todd was going to sign one for $25,000 and that he (Wild) wanted Appel to sign one for $25,000. Appel said, "All right, Frank, I will do it," and he signed a note in the amount stated, payable to the order of the bank. A few days previous to this, Wild had talked to Appel and had asked for some financial help, but did not say in what amount. He said he might want Appel to sign a note, that he wanted some accommodation notes to use in the bank, and wanted them given to the bank. Wild did not tell Appel that there had been an examination of the bank or that the bank commissioner had required him to get more money into the bank, nor did he explain how he wanted to use the notes, or what for—simply that he wanted to use them in the bank. Appel did not know that the capital of the bank was impaired at the time, but testified that "when Mr. Wild told me he wanted to use

this note in the bank, my notion was he wanted to use it." Wild testified that he might have said to both Appel and Todd that he desired their notes for the purpose of building up the undivided profits account of the bank.

Mr. Appel, who was in the insurance, real estate and loan business, and was a director in the Indiana National Bank, the Union Trust Company and the Railroadmen's Building and Savings Association was a close business associate of Mr. Wild. He knew of the bond theft from the Wild bank but did not know the amount thereof. He was a director of the Majestic Building Company (owned largely by the Wild bank), and was an officer of "Gregory and Appel," which had issued its notes, indorsed by Appel personally, to the extent of several million dollars, which had been delivered to (and sold by), the bank. At the date Appel executed the original note, December 10, 1926, he was indorser on $5,000 or more of "Gregory and Appel" paper in the Wild bank, on the date the note was renewed, he was indorser on more than $3,000 of the same paper, and at the time the bank failed, July 30, 1927, it held $75,000 of such paper bearing Mr. Appel's personal indorsement. Appel testified that he did not remember whether or not he withdrew his personal account of $1,500 the day before the bank closed its doors.

The makers of the notes, and Wild himself, testified that no consideration passed from the J. F. Wild & Co. to the makers for the notes.

Wild delivered the three notes obtained from Millikan in the sum of $50,000, from Todd in the sum of $25,000, and from Appel in the sum of $25,000, to the bank's cashier, who, at Wild's direction, entered them in the books on December 13, 1926. The notes were entered in the "discount and collection book," the same as all .

the notes the bank took in that day. The face value of the notes was added to the "loans and discounts" as shown by the books, increasing them in the sum of $100,000.

Four or five days after Mr. Millikan executed the note, he asked Mr. Wild, "Isn't it customary to give some kind of collateral for accommodation paper?" Wild said, "Well, I don't know, but I will give you security for it. I don't think there will be any liability to it, but I will fix up something." A day or two later, Wild handed Millikan an indemnifying agreement, signed by Wild personally, agreeing to indemnify and save harmless Millikan, Appel and Todd on account of the several notes executed by them to the Wild bank.

On December 11, 1926, the day after the notes were executed and delivered to the bank, or a day or so thereafter, Mr. Wild met the state bank commissioner at the Indiana National Bank and delivered to him $100,000 of Indianapolis school bonds. Wild did not tell the commissioner where he had obtained these bonds. As a matter of fact, the bonds were not obtained from friends of Wild (as Wild had led the commissioner to believe) but were assets of the bank abstracted for this purpose. Their amount in the bank's subsequent financial statements was made up by listing as assets of the bank the notes of Millikan, Appel and Todd. The escrow agreement between the bank by its president and the state bank commissioner provided that the bank had deposited in escrow $100,000 in bonds of the board of school commissioners of the city of Indianapolis on account of any possible impairment of the capital stock of the bank, to be held for the benefit of depositors and creditors of the bank until such time as the capital stock should be increased or restored. That whenever, in the opinion of the bank commissioner, all questions of the impairment of the capital stock of the bank were removed,

either by an increase in the stock or by additional money being placed in funds of the bank, then the bonds should be returned to the bank. The agreement provided for a key for each party. The escrow holder, Indiana National Bank, agreed that the safety deposit box containing the bonds should not be opened except in the presence of both partries.

The three notes of Todd, Appel and Millikan were given for a period of six months. When they became due in June, 1927, the notes were taken up (paid) by renewal notes executed June 11 by their several makers. The renewal notes remained in possession of the bank until it was closed, and were then delivered to the receiver as a part of the assets of the bank.

Statements of the bank's financial condition were printed and distributed to the public by the bank, were mailed to every bank in the state of Indiana, and were published in the newspapers from time to time. The statement of the bank's assets included the $100,000 represented by these three notes and there was nothing in the statement to indicate that any part of the listed assets consisted of accommodation paper. A number of witnesses testified, and a stipulation was entered into between the parties, that other witnesses present in court would testify, that they read the statement of the bank's condition as printed or published in the newspapers on January 4, 1927, March 28, 1927, and July 4, 1927; that they believed the statements were true and that they left their money on deposit in the Wild bank because of the fact they believed the statements were true and made new deposits in the bank after reading the statements.

The bank made reports to the bank commissioner on December 31, 1926, and March 23, 1927, neither of which reports disclosed that any of the bank's listed assets consisted of accommodation paper. On the books

of the bank, however, the notes of Millikan, Todd and Appel were listed as "accommodation." Following the examination of the bank in December, the bank commissioner discussed with Mr. Wild the necessity of increasing the capital stock in accordance with the volume of business being done by the bank. In June, 1927, examiners from the department of banking again examined the bank. They found and reported to the bank commissioner the fact that $100,000 worth of notes listed in the assets were being carried on the books as accommodation notes. The bank commissioner made demand upon the officers that they remove these notes from the assets of the bank and restore the capital of the bank quickly. This could not be done, and, soon thereafter the commissioner instituted proceedings and closed the bank. At the time this action was tried below, it had been ascertained that the bank was insolvent and that the liabilities to creditors exceeded the amount of all assets (exclusive of the notes in question), plus such an amount as could be obtained by the enforcement of the double stockholders' liability provided for by law. It follows, therefore, that recovery upon the three notes in question would inure to the benefit of the creditors of the bank and not merely to the stockholders thereof.

Upon the foregoing facts, it seems clear to us that there is a liability on the part of the makers of the notes to the creditors of the bank, who are represented by the receiver, and that the decision and judgment of the trial court is not sustained by sufficient evidence and is contrary to law.

The appellees (following the reasoning of the trial court, which appears in the written opinion which is before us), seek to sustain the judgment on the ground that the notes given by them were accommodation paper, that, as between the makers and payee of such paper there is no liability, and that the receiver of the payee

stands in the place of the payee and can assert no rights that could not be asserted by the payee.

The Uniform Negotiable Instrument Law (ch. 63, Acts 1913, §11360 *et seq*. Burns 1926) defines an accommodation party as "one who has signed the instrument as maker, drawer, acceptor or indorser, without receiving value therefor, and for the purpose of lending his name to some other person." §29 of the act, §11388 Burns 1926. The accommodation maker is not liable to the accommodated party, *State Bank* v. *Markworth* (1927), 203 Iowa 461, 212 N. W. 729; *Perley* v. *Wing* (1926), 82 N. H. 299, 133 Atl. 26; *Webb* v. *Pleasants* (1926), 144 Va. 516, 132 S. E. 175, and, if sued by such party, may set up want of consideration, *First Nat. Bank* v. *Limpp* (1926), 221 Mo. App. 951, 288 S. W. 957; *King* v. *Wise* (1926), 282 S. W. (Tex. Civ. App.) 570. The fact that the accommodation party has taken security for the loan of his credit does not affect the rights of a party or prevent the paper from being accommodation paper. Joyce, Defense to Commercial Paper §52; 8 C. J. 255.

The liability of a maker of accommodation paper rests upon the principle of estoppel and arises only when the rights of third parties intervene, as to which parties he is estopped from denying liability. The rights of third parties usually intervene by the indorsement of the accommodation paper by the payee, and this has resulted in the statement in many cases that there is no liability on accommodation paper until the same is negotiated by indorsement. Thus, it is said that:

> "Ordinarily an accommodation note is one that is made for the purpose of enabling the payee to obtain credit; and as such it has no validity until it is discounted or passes into the hands of a holder for value." 3 R. C. L. 1137;

and that:

> "Accommodation paper has no legal inception until it is negotiated for value." [1] Joyce, Defense to Commercial Paper, §52.

It is stated in the English texts and cases that "an accommodation bill is not issued until it comes into the hands of some person who can sue upon it." Maclaren, Bills, Notes and Cheques, §55, p. 184.

> "The maker of an accommodation note cannot set up the want of consideration as a defense against it in the hands of a third person, though it be there as collateral security merely. He who chooses to put himself in the front of a negotiable instrument for the benefit of his friend, must abide the consequence: [*Walker* v. *Bank of Montgomery* (1825)], 12 Ser. & R. 382), and has no more right to complain, if his friend accommodates himself by pledging it for an old debt, than if he had used it in any other way. . . . Accommodation paper is a loan of the maker's credit without restriction as to the manner of its use." *Lord* v. *Ocean Bank* (1853), 20 Pa. St. 384, 59 Am. Dec. 728.

In the case at bar, the makers of the notes placed no restriction upon the use to be made of them by the bank. The bank removed from its assets bonds worth ▮ $100,000 and used them (as if they had come from an outside source) to guarantee to the state banking department that an impairment of the capital would be made good. The bank "replaced" these bonds with the notes; the substituted notes became a part of the assets of the bank and the bank included the amount of the notes in the public-published statement of its assets. By reason of this, the bank was clothed with such an appearance of genuine assets as induced the bank examiner to regard it as sound and permit it to continue in business. In the published reports, upon which the public had a right to rely, these notes figured as resources, and the public and the depositors were deceived

thereby and induced to make further deposits. These facts are sufficient—in case of the insolvency of the bank and suit by the receiver on the notes—to create liability on the part of the makers thereof the same as if said paper had been negoitated by indorsement to any third party. The "intervention of the rights of third parties" is as effective in fixing liability on accommodation paper, as is "transfer by indorsement." The bank "had the loan of the makers' credit without restriction." *Stephens* v. *Monongahela National Bank* (1879), 88 Pa. St. 157, 32 Am. Rep. 438. This credit was used by the bank by placing the notes with its assets and holding out to the public, depositors, creditors and bank examiners that such sum was a part of its assets.

It frequently has been held that a bank, as a going concern, cannot recover against makers of accommodation notes given to it without consideration, even though the notes were given for the purpose of covering up a shortage, *Central Bank & Trust Co.* v. *Ford* (1913), 152 S. W. (Tex. Civ. App.) 700; or of deceiving bank examiners as to the condition of the bank, *First Nat. Bank* v. *Reed* (1926), 198 Cal. 252, 244 Pac. 368; as to bad loans which the examiner had ordered charged off, *Anamoose Nat. Bank* v. *Dockter* (1927), 56 N. D. 33, 216 N. W. 206; as to excess indebtedness of a bank officer, *Woodbury* v. *Glick* (1911), 151 Iowa 648, 132 N. W. 67, or as to whether certain loans were in excess of the amount permitted by law, *First State Bank* v. *Morton* (1912), 146 Ky. 287, 142 S. W. 694. But it uniformly appears in such cases that there was no loss to the creditors of the bank by reason of such transactions, and no question arose in them as to estoppel of the makers to assert their defense against innocent third parties whose rights had been prejudiced. Thus, in *Cripple Creek Bank* v. *Rollestone* (1921), 70 Colo. 434, 202 Pac. 115, where a bank cashier, in order to maintain its capital

and satisfy the bank examiner, guaranteed by indorse-ment a note listed in the bank's assets, it was held that, as between the bank and the indorser, there was no con-sideration for the guaranty and no action could be main-tained against him for the amount of the note, but the court said:

"Of course, had the bank become insolvent, and this note as an asset had passed into the hands of a receiver, he would, as the representative of the creditors, have a right of action against the de-fendant."

The proposition is clearly stated in *Golden* v. *Cervenka* (1917), 278 Ill. 409, 116 N. E. 273; *Niblack* v. *Farley* (1919), 286 Ill. 536, 122 N. E. 160; *Streeter* v. *Junker* (1923), 230 Ill. App. 366, and *First State Bank* v. *Holsen* (1927), 245 Ill. App. 75, as follows:

It is undoubtedly the law that "where notes . . . have been executed to a bank for the purpose of making an appearance of assets, so as to deceive the examiner and enable the bank to continue busi-ness, although the circumstances may have been such that the bank itself could not have collected the securities, . . . the receiver, representing the creditors, could maintain the action, and the makers were estopped, upon the insolvency of the bank, to allege want of consideration" for the notes.

A receiver of an insolvent corporation represents the creditors as well as the stockholders, and holds the property for the benefit of both, and, as trustee for creditors, can maintain and defend actions which the corporation could not, *Franklin Nat. Bank* v. *Whitehead* (1898), 149 Ind. 560, 49 N. E. 592, 39 L. R. A. 725, 63 Am. St. 302. A receiver has author-ity to maintain such an action as this, *State Bank of Pittsburg* v. *Kirk* (1907), 216 Pa. 452, 65 Atl. 932; *Lyons* v. *Benney* (1910), 230 Pa. 117, 79 Atl. 250, 34 L. R. A. (N. S.) 105. In the case last cited, the court, in

discussing the enforcement of liability on a similar note, said:

> "While the general rule . . . is that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself and a defendant in a suit brought by him may take advantage of any defense that might have been made if the suit had been brought by the corporation before its insolvency, it is equally true that when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid as against the corporation itself. In such a case he may maintain an action which the corporation itself could not."

The banking business is one of public concern, and it is regulated and examined by a department of the state government in order that the public may be protected and not be misled. Those who participated in a transaction by which the assets of a bank are given a favorable appearance for the purpose of examination, but less favorable for purposes of liability or enforcement, are participating in a transaction which is fraudulent as to the public and as to the creditors and depositors, in whose behalf the regulation of banks is imposed, *Valley, Rec.,* v. *Devaney* (1923), 49 N. D. 1107, 194 N. W. 903; *Cedar State Bank* v. *Olson* (1924), 116 Kans. 320, 226 Pac. 995. In *Lyons* v. *Benney, supra,* it was said:

> "It will never do for the courts to hold that the officers of a bank, by the connivance of a third party, can give to it the semblance of solidity and security, and, when its insolvence is disclosed, that the third party can escape the consequences of his fraudulent act."

Where one by giving accommodation notes is instrumental in clothing a bank with such an appearance of genuine assets as induces a bank examiner to regard it

as sound and to permit it to continue in business, and where, in its published reports, such person's notes figured as resources and the public relies thereon and entrusts the bank with its money, the maker of the note is estopped, as against the creditors, to say that his notes were other than what on their face they purported to be, or that the appearance which was given to the books of the bank was not genuine, *Murphy, Rec.,* v. *Gumaer* (1902), 18 Colo. App. 183, 70 Pac. 800; *Engen* v. *Matthys* (1924), 50 N. D. 487, 196 N. W. 550; *Putnam* v. *Chase* (1923), 106 Ore. 440, 212 Pac. 365. If, by reliance upon such securities, depositors were induced to make and leave deposits in the bank, then, on the clearest principles of justice and morality, the maker of the securities should be estopped from denying their validity, *Best, Rec.,* v. *Thiel* (1879), 79 N. Y. 15. Neither the law nor good conscience will otherwise permit. *German American Finance Corp.* v. *Merchants, etc., State Bank* (1929), 177 Minn. 529, 225 N. W. 891, 64 A. L. R. 582.

All of the cases cited in the foregoing paragraph are similar in their facts and holdings to the decision herein. In most of them, the makers of the notes had knowledge of the specific use to which the notes were to be put, while, in the case at bar, the notes were executed by their makers without any limitation upon the use to which they would be put, but the use made of them was not unauthorized and was such as could reasonably have been anticipated by their makers.

It follows that the finding and judgment of the trial court in favor of the appellees are not sustained by sufficient evidence and are contrary to law.

The finding of the trial court in favor of the appellees was, in effect, a finding, *first,* that there was no consideration for the notes, and *second,* that, being accommodation notes executed, without consideration, the

makers were not liable thereon in a suit brought by the receiver of the insolvent bank which held them. Without questioning the decision of the court on the first proposition, we have pointed out in this opinion that, assuming the notes to have been accommodation notes without consideration, still the evidence is not sufficient to support a finding for the appellees, and that such finding is contrary to law.

In the view that we take of these cases, it will not be necessary to remand the same for new trials. If we grant that the notes were accommodation paper, executed without consideration, even then, under the undisputed facts, we have held (deciding the question of law presented by the parties) that the makers are liable thereon. The several judgments are reversed, with directions to the trial court to render judgment for the appellants on their cross-complaints.