COUNTY TRUST COMPANY OF NEW YORK, Appellant, *v.* TIMOTHY J. MARA, Respondent.*

COUNTY TRUST COMPANY OF NEW YORK, Appellant, *v.* PATRICK F. KENNY, Respondent.*

First Department, July 19, 1934.

* Affd., 266 N. Y. ——.

*Joseph M. Proskauer* of counsel [*A. Hayne de Yampert* with him on the brief; *White & Case*, attorneys], for the appellant.

*I. Gainsburg* of counsel [*Epstein & Goodman*, attorneys], for the respondents.

TOWNLEY, J. These actions are brought on renewal notes made by the defendants to the order of the plaintiff for $50,000 and $20,000, respectively, dated November 24, 1930, and payable six months after date. The original notes were for $50,000 and $25,000, respectively. The answers admit making the notes but plead that they were made for the plaintiff's accommodation without consideration; that the plaintiff is not a holder in due course, and that there was a delivery dependent on a condition precedent which never came into effect. The answer of Kenny also sets up that the plaintiff agreed to save the defendant harmless.

The notes were given as the result of a transaction which took place during the campaign of Governor Smith for the presidency in 1928. Riordan, the then president of the plaintiff, was also a member of the finance committee of the Democratic National Committee of the State of New York. At a meeting of some of those interested in the campaign, during the month of October, 1928, the defendants at the request of Riordan, signed an underwriting agreement, under the terms of which each of them unconditionally guaranteed that he would " on demand pay the amount set opposite his signature * * * toward the deficit if any incurred by the Democratic National Committee in the conduct of the presidential election campaign of 1928." Mara signed for $50,000; Kenny signed for $25,000. There were other signatures which brought the total of the underwriting up to about $900,000.

It is claimed by defendants that the obligation under this agreement was limited to any deficit in an estimated budget of $4,000,000, although the agreement itself contains no such limitation. Evidence of such limitation was received on the trial over the objection of the plaintiff that the receipt of such evidence violated the parol evidence rule. The receipt of this evidence was error. While it is true that the rule has no general application in disputes involving strangers to the agreement, it is applicable when the matter in controversy originates in the relations estab-

lished by the instrument in question. The rule was correctly stated by Mr. Justice BISCHOFF in *Spingarn* v. *Rosenfeld* (4 Misc. 523, 527): " True, the rule does not apply between the parties to the instrument and a stranger; but that is so only when the latter asserts a right independent of, and not growing out of, the instrument, or when the right asserted does not originate in the relations established by the instrument. Otherwise, the rule prevails." (See, also, *Selchow* v. *Stymus*, 26 Hun, 145.) The bank was not a party to this agreement but the notes in suit were given by defendants in adjustment of the obligation assumed thereby. (See, also, Wigm. Ev. [2d ed.] § 2446.)

After the defendants signed the underwriting agreement they heard nothing further about it until April 24, 1929, when they received a letter from John J. Raskob, as chairman of the Democratic National Committee, stating that there was a deficit and calling on them for payment of the full amount of their subscriptions. Following this demand, a meeting of the underwriters was held at which defendants and others claimed they were to be liable only in case $4,000,000 was not raised. The conceded subscriptions amounted to over $5,000,000. A committee, of which the defendant Mara was a member, was appointed to call on Raskob. Raskob refused to recognize any condition as attached to the subscription and insisted that the amount of the underwriting be paid. This was refused and suit upon the underwriting agreement was threatened.

Thereafter, on or about the 15th of May, 1929, Riordan asked Kenny and Mara to come to the bank. Mara testified that at that meeting: " He [Riordan] told me that they had arrived at a plan to straighten out the underwriting agreement; that the National Democratic Committee was indebted to the County Trust Company, and that they had formed a plan first to sign individual notes so that the bank could be secured instead of the security of the National Democratic Committee, and spread this money that was owed them amongst the different banks. I told Mr. Riordan I could not see it advisable for myself to take myself off one underwriting and put myself into a note proposition. Mr. Riordan at that time assured me, he said to me, don't worry, this is only a matter of form to straighten this matter out; it is helping the bank to straighten out the loans made to the National Democratic Committee, there will be no interest attached to the notes, you will never hear another thing about that." Mara further testified that Riordan told him that the bank would take care of the note, but he disavowed any suggestion that the bank was to stand the loss. This conversation was not denied. Riordan had died prior to the trial and no one other than defendants was

present when the conversation took place. Both defendants testified that they understood the notes would have to be paid, but not by them. It is this conversation upon which defendants principally rely to establish their defense. We shall assume that such conversation took place substantially as stated.

Defendants did not sign the notes on that occasion, but did a few days later when Riordan told them that all of the other underwriters had signed. The notes were payable without interest. In exchange for the notes defendants received checks of the plaintiff for $50,000 and $25,000, respectively. On the back of each of these checks was a typewritten indorsement " Pay to the order of Democratic National Committee." Each of the checks was indorsed by the defendant-payee and returned to the bank. They were deposited to the credit of the Democratic National Committee and the committee was credited with the amount thereof as a payment in reduction of their debt to the bank. By this transaction the bank released the obligation of the Democratic National Committee to the extent of the amount represented by the notes and accepted the obligation of the defendants in place thereof. The notes were renewed several times extending over a period of nearly two years. After a time defendants were required to pay interest which they testified was done on the assurance of the officers of the bank that the matter would shortly be closed up by subscriptions coming into the Democratic National Committee. Later there was a partial reduction of Kenny's indebtedness by the application of $5,000 which had come into Riordan's hands from contributors.

The only issue which was submitted to the jury was that of conditional delivery.[1] The court charged the jury in this connection as follows: " The defendants have admitted the regularity of the note and execution. They set up the fact * * * that the notes were delivered upon a contingency which affected the liability of the defendants; they were, it is argued, only to be liable in the happening of a certain contingency and not if that contingency did not occur. In other words, the notes and their consequent liability, they claim, were to come into existence only if the $4,000,000 were not raised.

" You have heard the testimony of the conversations had with Riordan, now deceased, and, of course, unable to give his version. You remember for yourselves all that has been said concerning the whole transaction and the relation of the parties, what they were, for the purpose of telling whether or not the notes in suit were made and delivered under any condition, and, if so, what the condition was."

At the conclusion of the charge, counsel for the plaintiff duly excepted to the submission to the jury of the facts assumed by the court in its charge and to the submission of any question of conditional delivery. The colloquy between court and counsel in this connection was as follows: " Mr. Proskauer: You stated at the time they gave the note they understood they were not to pay if the budget exceeded $4,000,000. The testimony is, at the time they gave the note that they knew the $4,000,000 had been raised and that the budget had been raised. The incident to which you refer was at the time the underwriting agreement was made.

" The Court: I think there is no doubt about it. I correct my statement. You must not pay too much attention, gentlemen of the jury, to what the court said about the facts; your own memory controls, not the court's or counsel's.

" Mr. Proskauer: I except to the submission of the case to the jury at all on the ground that there is no evidence of a condition precedent of the delivery of these notes, and I except to the submission of that question to the jury."

The court by this subsequent instruction withdrew from the jury the only condition which had been stated as possibly affecting defendants' liability upon the notes and yet the jury were left to exonerate the defendants upon some theory of conditional delivery of which there was no evidence in the record. The conversations with Riordan express no condition which was to attach to the delivery of the notes, but are at most an assurance by him that the defendants would never be called on to pay the notes. The submission of this wholly false issue to the jury necessarily calls for a reversal of this judgment.

This appeal, however, presents the further question of whether any defense to these notes was established and whether the plaintiff's motion for a directed verdict should not have been granted. There is no substantial issue of fact involved in this case. Its final disposition must depend upon the legal effect of the promise made by Riordan to the defendants prior to the delivery of the notes and what followed immediately thereafter. The first claim upon which defendants rely is that there was no consideration for the notes. The second claim is that since the arrangement was for the benefit of the bank in permitting it to substitute these notes for the obligation of the committee, Riordan's agreement that defendants would not be liable on them was binding on the bank.

Considering these claims in the order in which they have been stated, if we are to assume that the obligation of the defendants under the terms of the underwriting agreement was unaffected

by the condition relied on by them and that these notes were given in discharge of this obligation, there is ample consideration for the notes. If we are to assume, however, that there was no obligation on their part under the underwriting agreement at the time these notes were given, there would nevertheless be sufficient consideration in the change of position on the part of the bank involved in its release of the Democratic National Committee from its obligation to the bank and its acceptance of the notes in suit in place thereof. The Court of Appeals so held in *Grannis* v. *Stevens* (216 N. Y. 583), where the facts with regard to consideration were substantially the same as those involved herein. In their opinion in the *Grannis* case the court distinguished *Higgins* v. *Ridgway* (153 N. Y. 130), relied on by respondents, on the ground that there was no consideration for the note litigated in that case.

The discharge of a pre-existing debt owing by a third person is a legal consideration for the promise of another to pay such debt. (*Citizens' National Bank* v. *Lilienthal*, 40 App. Div. 609; *Bacon* v. *Montauk Brewing Company*, 130 id. 737.) In other words, to have an adequate consideration for a promise, the benefit need not move to the promisor and the discharge of one person from liability under a debt is a sufficient consideration for the promise of another to pay. (*Hayes* v. *Mestaniz*, 9 Misc. 705; affd., 150 N. Y. 561; *Rector, etc.*, v. *Teed*, 120 id. 583.) In the latter case Vann, J., said: " The consideration did not rest upon any advantage to the defendant, but upon the abandonment by Thomas Wright of his position as a contestant. By discontinuing his effort to overthrow the will, he relinquished a right secured to him by law and lost his chance of inheriting the estate. He did this at the request of the defendant who promised to pay for it."

Defendants' other claim is that the whole arrangement was for the accommodation of the bank to avoid embarrassment with the bank examiners and that the defendants' absolute promise to pay was to have no legal effect. Concerning this type of claim, Wigmore (Ev. [2d ed.] § 2406) lays down the rule of law as follows: " When the document is to serve the purpose of a mere sham, this principle in strictness exonerates the makers; but a just policy would seem to concede this only when the pretense is a morally justifiable one (as, to calm a lunatic or to console a dying person), and not when it is morally beyond sanction." (See, also, *Gumz* v. *Giegling* (108 Mich. 295); *Denny* v. *Fishter* (36 S. W. [2d] 864); *Niblack* v. *Farley* (286 Ill. 536); *Pauly* v. *O'Brien* (69 Fed. 460); *Iglehart* v. *Todd* (178 N. E. 685). In *Hurd* v. *Kelly* (78 N. Y. 588) and *Best* v. *Thiel* (79 id. 15) the Court of Appeals held that on the suit of a receiver the obligors of promises made to banks

to deceive bank examiners were, on grounds of public policy, estopped from setting up a secret agreement with the bank. In *Mars National Bank* v. *Hughes* (256 Penn. St. 75) and *State Bank* v. *Olson* (116 Kan. 320) it was held that such obligors are estopped from setting up such defenses even as against the bank itself.

In principle, the bank officers manifestly have no power to make agreements for the purpose of deceiving the State's bank examiners. They certainly have no authority to substitute notes for existing assets and agree that the notes shall not be enforcible. The interests of the stockholders, general creditors and depositors are thereby jeopardized. The recovery allowed by estopping the obligor · from setting up the illegal and immoral contract may incidentally inure in part to the benefit of the officer of the bank who negotiated it, but the protection of the interests of innocent stockholders and depositors is paramount. It would involve a complete misconception of values to hold that under such circumstances, the bank, regarded as a separate entity, is *in pari delicto* with the obligors on the instrument. In this connection, the language of Mr. Justice MARTIN used in discussing in general the State's statutory policy setting up safeguards relating to banks is peculiarly apt: " To uphold the transaction upon which this litigation is founded would largely reverse this policy and seriously augment the risks and dangers to the public inherent in the business of banking." (*Norwalk* v. *Marcus*, 235 App. Div. 211, 213.)

The cases discussed above establish the rule that a person may not participate in a transaction, the object of which is to give the assets of a bank a more favorable appearance than they would otherwise have and then except liability upon the obligation given to create that appearance. In those cases there was no element of loss to the bank by the discharge of good liabilities in exchange for fictitious notes. In the case at bar this further element is present. Plaintiff has changed its position by reducing its assets in the amount of $70,000. If these notes are declared void, plaintiff will, therefore, suffer an actual loss of that amount.

It is clear that there is no defense to these notes either in law or in fact. The judgments accordingly should be reversed, with costs, and judgments should be directed for the plaintiff as prayed for in the complaints, with costs.

FINCH, P. J., and O'MALLEY, J., concur; MARTIN and GLENNON, JJ., dissent and vote for affirmance.

MARTIN, J. (dissenting). The plaintiff, a banking institution, brought actions against the defendant Timothy J. Mara upon a note for $50,000, and against the defendant Patrick F. Kenny

upon a note for $20,000, both notes being dated November 24, 1930, and being payable six months thereafter. The original notes were for $50,000 and $25,000, respectively.

Similar defenses were interposed in each case to the effect that the respective notes were executed for the accommodation of the plaintiff without consideration, that the plaintiff was not a holder in due course, and that the notes were delivered conditionally for plaintiff's accommodation without intent that property in the instruments should be transferred. The notes were offered in evidence and the plaintiff rested.

It is important at the outset to note that the case was before this court on a prior appeal from an order denying a motion made by plaintiff for judgment on the pleadings. This court then unanimously sustained the decision of Mr. Justice UNTERMYER given at Special Term to the effect that there was a question of fact which should be submitted to the jury (236 App. Div. 720). In his opinion he said: " The defendant asserts, in substance, that the plaintiff, nevertheless, desired the committee to receive the amount of the subscription, and for that purpose procured him to deliver his note to the plaintiff on the express condition that he would not be held liable thereon. He charges, therefore, that there was no consideration for the note; that it was executed and delivered by him solely for the accommodation of the plaintiff and that the proceeds of the ostensible loan were used by the plaintiff for its own purposes. However improbable the defendant's version of the transaction may appear under all the circumstances which the papers disclose, it presents an issue of fact which will be available to the defendant at the trial (*Bernstein* v. *Kritzer*, 253 N. Y. 410; *Higgins* v. *Ridgway*, 153 N. Y. 130) and which cannot be summarily determined on conflicting affidavits."

The jury has found that the defenses were true and has determined all the facts in favor of the defendants. It is now argued that this court should reverse its former decision holding there was a question of fact for the jury, and also the judgment founded on the verdict of the jury. If that decision was correct, the defendants are entitled to an affirmance of the judgment entered upon the verdict of the jury. The jury has very properly found that there was an agreement that the notes should not be a binding obligation on the defendants, the existence or non-existence of which agreement was for the decision of the jury. (*Benton* v. *Martin*, 52 N. Y. 570; *Bookstaver* v. *Jayne*, 60 id. 146; *Grierson* v. *Mason*, Id. 394; *Juilliard* v. *Chaffee*, 92 id. 529.)

To review the questions involved it is necessary to recite a few of the very interesting facts which set forth the entire transaction

and disclose why the notes in suit were made, keeping in mind that all questions of fact have been decided by the jury in favor of the defendants.

The defendant Mara testified that he and the defendant Kenny very much desired the election of former Governor Alfred E. Smith to the presidency of the United States in 1928, and to that end co-operated with his friends, Mr. John J. Raskob, chairman of the Democratic National Committee, and Mr. James J. Riordan, president of the plaintiff, County Trust Company of New York.

During October, 1928, Mr. Riordan called the defendant Mara to the office of the plaintiff bank and advised him that the National Democratic Committee had a budget of $4,000,000 and that only $2,500,000 had been raised; that they were afraid to borrow any more from the banks. Mr. Riordan requested defendant Mara to sign a certain underwriting agreement for $50,000, but defendant said he could not afford that much money. Mr. Riordan told him not to worry, that the money to meet the budget would come in; that the bank could not loan any more money for the campaign unless there was security. The defendant Mara said that if it were a matter of signing his name to help the campaign he would do it. Mr. Riordan then told him that he would take the matter up again that evening.

On the evening of the same day, at No. 44 East Twenty-third street, New York city, Mr. Riordan handed the defendant Mara an underwriting agreement and asked him to sign for $50,000. The defendant Mara said he did not like to put his name down for that amount after all he had given. Mr. Riordan said: " Don't worry about this thing, the bank will take care of the matter, you will never hear from it again."

The defendant Mara signed the underwriting agreement (which was in any event conditional) for $50,000 and the defendant Kenny for $25,000. Several other persons also signed under similar circumstances.

That agreement provided as follows: " This agreement is not to be construed as a subscription to the campaign fund of the Democratic National Committee of 1928, but in the event subscriptions are not obtained from others sufficient to pay the expenses incurred, then the undersigned agree to pay such deficit, proportionately but not to exceed the amount of their several underwritings."

At this point it may be well to note that it is claimed by defendants that they not alone proved that there was an agreement that the underwriting contract was limited to a budget of $4,000,000, but that in any event there was no deficit, and the jury has evidently found to that effect.

The defendant Mara said he heard nothing further about the matter until April, 1929, long after the election, when he received a letter from Mr. John J. Raskob, chairman of the Democratic National Committee, asking him to make good his agreement. Mr. Mara saw Mr. Riordan about the letter and Mr. Riordan called a meeting of all the subscribers at the County Trust Company. At that meeting Mr. Mara said he told Mr. Riordan that he was annoyed by the receipt of the letter from Mr. Raskob, as he had reason to believe that more than $5,000,000 had been received, and he could not understand why he should be held responsible under the $4,000,000 guaranty agreement after what Mr. Riordan had told him. Mr. Riordan said he would see Mr. Raskob about the matter. Shortly thereafter Mr. Raskob saw the defendant and told him that if the money was not paid an action would be brought.

On or about the 15th of May, 1929, Mr. Riordan asked the defendant Mara to stop at the bank, as a plan had been devised to straighten out the underwriting agreement. The witness was there asked to sign a note, and when he said he could not see the advisability of doing so, Mr. Riordan said: " *Don't worry, this is only a matter of form to straighten this matter out; it is helping the bank to straighten out the loans made to the National Democratic Committee, there will be no interest attached to the notes, you will never hear another thing about that.*" Mr. Riordan also informed Mr. Mara that the bank would take care of the note and that he (Mara) would not be expected to pay the amount thereof; that it was not to be a binding obligation.

Thereupon the defendant Mara signed the note for $50,000 payable to the order of himself and on which he placed his indorsement in blank. There was no other indorsement thereon. The note was given to the bank messenger and thereafter a check for $50,000 was received on which had already been typed the indorsement, " Pay to the order of Democratic National Committee." He indorsed the check and gave it to the messenger. No interest was paid on the first note and the defendant was not charged with any discount. In November the note was returned and for the first time Mr. Mara saw Mr. Raskob's indorsement thereon. This indorsement was made without his knowledge or request. When the first note became due defendant received by mail a renewal note for $50,000 with a request to sign, which he did. In the meantime Mr. Riordan had died. The second note became due in May, 1930, and the defendant received a notice to that effect.

The defendant Mara then called to see former Governor Smith, who had been elected chairman of the board of directors of the bank. Governor Smith told him if he signed another note and

paid interest that in the near future the whole matter would be straightened out, because subscriptions to the National Democratic Committee were coming in and the money would take care of all obligations without annoying the defendant. The defendant then told former Governor Smith about the whole arrangement made with Mr. Riordan and the Governor said the defendant never should have signed the original note. The defendant Mara at the request of the bank paid interest on a third or renewal note which he signed. It became due in November, 1930, and the defendant Mara went to see Governor Smith again and was told that the latter had washed his hands of the whole affair. The defendant then saw Mr. Kelly, the president of the bank. Mr. Kelly persuaded him to sign a renewal note as a personal favor, as bank examiners were going over the bank records and it was embarrassing to have the notes around. It was explained to Mr. Mara that when Mr. Raskob returned he would straighten out everything. The note of May, 1930, which became due November 22, 1930, was not protested so that the bank could hold the indorser, and a renewal was not executed until December 30, 1930, although dated November 24, 1930. When it became due the defendant Mara refused to pay and this suit was brought.

The defendant Kenny testified to similar facts with respect to his signing the underwriting agreement and a note for $25,000. He subscribed when Mr. Riordan told him he would never be called upon to pay it as money would be obtained to take care of the budget; when asked to make a note for the same sum he refused at first but consented when Mr. Riordan said, " P. F. I would like you to do this for me. Now the rest of the fellows are going along with me, and it is all going to be taken care of, the bank will pay it, and you will not have to pay interest, and it will be taken care of. * * * He told me not to bother about it, that the bank would take care of it."

Renewals were made as in the case of the note of the defendant Mara, and the note was indorsed by Mr. Raskob without the knowledge or consent of Mr. Kenny. A check for $25,000 was sent by the bank to Mr. Kenny with a typewritten indorsement to " Pay to the order of Democratic National Committee," which he signed and returned by the bank messenger. We here have one feature not found in the Mara case. In August, 1929, Mr. Riordan gave Mr. Kenny $5,000 in bills to make a payment on the note out of $20,000 which he said he had in his possession, $15,000 of which Mr. Riordan said he was giving to other underwriters who had made similar notes to make similar payments. Defendant Kenny accepted the $5,000 and drew a check for that sum dated August

26, 1929, to the order of the County Trust Company which he sent to the bank. This check was sent two months before the note became due or was renewed.

Mr. Kenny also testified to conversations with former Governor Smith to the same effect as Mr. Mara. In May, 1931, Mr. Kenny refused to sign a renewal note. There was another talk with former Governor Smith at which Mr. Mara was present. The Governor asked Mr. Kenny and Mr. Mara to keep renewing the notes and to pay interest so as to protect the bank and the matter would be taken care of at some future time. Mr. Kenny on June 5, 1931, sent his check for interest at the request of the bank, although it is asserted that the notes contained no obligation to pay interest.

Former Governor Smith, the chairman of the board of directors of the plaintiff trust company, testified that he told the defendants there was no way that any adjustment could be made so far as the bank was concerned; that the money was borrowed from the bank and would have to be paid back; *he admitted* that the defendants had told him about the arrangement with Mr. Riordan and that the defendants consented to renew the notes. Not only did these defendants tell him about the arrangements with the bank through Mr. Riordan but he testified that the makers of several other similar notes told him of a similar arrangement, showing conclusively that the story told by these defendants was true, for it was substantiated according to former Governor Smith by the makers of at least three other similar notes. On this subject the witness testified as follows: " Q. Did they also speak to you about any arrangement they had made with Mr. Riordan? * * * A. *Yes, they practically all told me that they had assurances from Mr. Riordan that they were not to pay this money.* Q. And when you say that, may I help your memory by mentioning a few names; D. A. Harrington? A. Yes. Q. Riordan? A. Yes. Q. George Van Namee? A. Yes. Q. James Geoghan? A. Yes, Geoghan, too. * * * Q. Mr. Guilford? A. No. Q. Now they told you they had made some arrangement with James J. Riordan? A. Is that a question? Q. I was coming right down to it. You did not doubt Mr. Mara's word, did you? A. No. Q. You did not doubt Mr. Kenny's word? A. No. Q. You did not doubt Harrington's? A. No. Q. You did not doubt Van Namee's? A. No. Q. You did not doubt Geoghan's? A. No."

On the issues of fact, including that of consideration, conditional delivery of the notes, the circumstances of the renewals, the payment of interest and part payment of the Kenny note, the jury found for the defendants. The appellant has overlooked the fact that the jury found all the facts in the defendants' favor and

found that the transaction took place as testified to by the defendants. Any other verdict would have been against the overwhelming weight of the credible evidence. Although the jury has found that such an agreement was made we are asked to reverse this judgment and to hold that such an agreement was not made, and if made may not be enforced. If there was such an agreement, why should it not be enforced?

The appellant contends that its motion for directed verdicts should have been granted because defendants' testimony of alleged oral agreements with the plaintiff's president, Mr. Riordan, shows the defendants' notes were delivered upon a condition subsequent as a matter of law, which may not be shown by parol evidence and there was no question of fact for consideration by the jury. It is also urged that the judgment appealed from should be reversed and judgment directed for the appellant because defendants' oral testimony was improperly received in that it (a) contradicts the terms of the written instrument; (b) sets up an agreement to which Mr. Riordan could not bind the bank as it was beyond his power, and (c) sets up an *ultra vires* agreement.

The respondents contend that the notes were without consideration to them, and were conditionally delivered; that the controversy being between the original parties, the notes may not be enforced, not alone because there was no consideration but they were issued on condition that they should not be a binding obligation and that the defendants would never be held on them; that the renewal of the notes and part payment of one of them and payment of some interest under the circumstances disclosed constituted no ratification; that the conditional agreement under which the notes were executed was by the authority of the president of the bank, who had full power to bind it; that the issues were properly submitted to the jury without material exceptions to the charge and upon the evidence the verdict was properly rendered in favor of the defendants. It is argued that the bank may not accept Mr. Riordan's acts or statements which benefit the bank and repudiate all his unfavorable acts, and that if he had no authority to bind the bank, he had no authority to bind the defendants for the bank; that the bank benefited by and accepted and acted upon his representations and is, therefore, liable.

There is no doubt that these notes were not made in the regular course of business to be paid or to be binding obligations on the defendants. They were never protested, although duly indorsed by a financially sound indorser; no discount or interest was charged and the indorsements were placed thereon long after the notes

were made. The renewals were made after there was a failure to protest, which would have made the indorser liable to the bank if the notes were valid obligations. Many circumstances surrounding the notes show that they were not made in the regular course of business for a real loan of money by the bank.

Banks do not treat notes which are considered real obligations as these notes were treated by the plaintiff. The defendants say that they did not receive anything for the notes; that there was no real loan; that the bank retained the money; that they were not liable on the underwriting agreement, the collections thereon having reached not only $4,000,000 but over $5,000,000. They assert that the whole transaction was to help the bank out of a very delicate situation after the campaign, by indicating an ostensible loan which could be exhibited to the bank examiners to justify the loan of upward of $1,500,000 made to the National Democratic Committee, part of which loan they say was unsecured.

To emphasize the fact that these notes were not regular in character, the defendants point out: (1) No discount was charged for the loan. (2) No collateral security was demanded or given, irrespective of the financial standing of the makers, or the fact that they had no accounts in the bank, and no indorser of the notes was then required. (3) No interest was charged to, or paid by, the makers of the original notes or on one or two of the renewals. Defendants say it is very unlikely that the maker of a note would not be called upon by a bank to pay interest thereon, if the note represented a real loan. (4) The payment of interest, if made, was made without the knowledge of the makers and by someone other than the makers. (5) The indorsement by Mr. Raskob was made without the knowledge of the makers of the notes, and without their request. (6) Mr. Riordan gave money to the defendant Kenny to make a part payment on Kenny's note and told him that he had also given $15,000 to make part payments on other similar notes; $10,000 to Mr. Gilchrist and $5,000 to Mr. Harrington. (7) If there was a real loan, why should the bank collect $20,000 from some source and arbitrarily allot it to partly pay several notes. (8) Interest, if paid to the bank, was not paid by or demanded from the makers of any of the original notes. (9) The notes were never protested in the face of the fact that there was a good indorsement thereon, the indorser being amply responsible for the full amount thereof. This in itself is a most remarkable procedure on the part of the bank claiming to have made a *bona fide* loan of $75,000 to the makers of notes. (10) Renewals were permitted to be made several weeks after the notes

were due and after a failure to protest the notes and hold the indorser. (11) The money claimed to have been loaned on the notes *never left* the bank but remained there as a part payment on the indebtedness of the National Democratic Committee and to relieve the indorser of the note from paying the same. (12) The checks were indorsed by the National Democratic Committee *before* they were delivered to the defendants for their indorsement to the National Democratic Committee.

The first question that arises is whether the notes were conditionally delivered. The circumstances surrounding the making of these notes, the payment of interest by some one other than the maker, and the method in which they were issued shows that they were conditionally delivered. It is clear that it was never intended that they should be binding obligations or paid by the makers. When the matter came before this court on a previous appeal it affirmed a decision by Mr. Justice UNTERMYER, in which he said it was for a jury to say whether these notes were conditionally delivered. His opinion very concisely stated the issues and was sustained by the cases of *Bernstein* v. *Kritzer* (253 N. Y. 410) and *Higgins* v. *Ridgway* (153 id. 130), cited therein. This court unanimously held he was right and sent the case back for trial before a jury. On that trial the jury evidently believed that there was no consideration for the notes; that they were conditionally delivered; that it was never intended that they should be binding obligations or to be paid by the makers thereof.

As the attorney for the appellant very well stated upon the argument, a jury will, at all times, find for the defendants on the issues. A jury should do so on the evidence in this record.

The facts in this case differ materially from those found in the cases cited by the appellant. Here, not one but several matters conclusively show that it was intended that the men who signed these notes were not to be called upon to pay, and that the notes were given on that condition and were for the accommodation of the bank, and were not to be considered binding obligations.

In the case of *Garfield National Bank* v. *Colwell* (57 Hun, 169) the court held that where there was a distinct understanding between the maker of the note and the payee, of which the bank had notice, that the maker should incur no liability by signing the note and that he would not be held liable by the bank which had discounted the note, there could be no recovery. (See, also, *Benton* v. *Martin*, 52 N. Y. 570.)

The binding force of such representations by the officers of a bank was again sustained in *Chelsea Exchange Bank* v. *LaHiff* (219 App. Div. 434) where the court held that the bank officials

making such representations bound the bank. (See, also, *Benton* v. *Martin, supra; Thomas* v. *Scutt,* 127 N. Y. 133; *Smith* v. *Dotterweich,* 200 id. 299; *Title Guarantee & Trust Co.* v. *Pam,* 232 id. 441, and *Williams* v. *First National Bank,* 45 App. Div. 239; affd., 167 N. Y. 594.)

One of the leading cases on this subject is *Higgins* v. *Ridgway* (153 N. Y. 130), in which case the defendant was asked by the president and cashier of a bank at the time the note in suit was given, to make a note for $15,000. He was told that it would be a convenience to the bank, and that he would not be responsible for it; that while he would get nothing for it, he would not be held liable on it. The same arrangement was repeated at the time of the renewal of the notes, the action having been brought on the renewals. The defendant testified that he received no benefits from the note, either from the bank or any one else. The court there held: " We think the import of the defendant's evidence is that the delivery of the note in suit, as well as the note it was given to renew, was conditional and was for the accommodation and to serve some particular purpose of the bank. Therefore, as there was no consideration for the note, and as the bank could not be regarded as a *bona fide* holder, we are of the opinion that the plaintiff's exceptions to the refusal of the court to direct a verdict for the plaintiff, and to the charge of the court, were invalid."

In *Williams* v. *First National Bank* (45 App. Div. 239; affd., 167 N. Y. 594) a similar transaction was under consideration. There the plaintiff had a deposit with the bank, which the latter used as a set-off against a note of $2,000, which bore plaintiff's name as comaker and which was renewed three months later. Plaintiff established that at the time the original note was delivered to the bank there was an agreement between the parties to the note and the cashier that it should not be used as any evidence of liability except as it became necessary to show it to a bank examiner; and the note was delivered upon condition that the same would not be enforced against the makers or either of them. It was there held that there was no liability.

There are a number of cases which give abundant authority for holding that where a note is given to a bank so that the bank may have it to show an apparently regular transaction, and there is an agreement that the maker of the note is not to be held responsible for the note, there is no liability. Why should such a contract or agreement not be enforcible? The verdict of the jury having established that such was the fact, the law exempts the

defendants from liability. (*Reynolds* v. *Robinson*, 110 N. Y. 654; *Burke* v. *Dulaney*, 153 U. S. 228; *Niblock* v. *Sprague*, 200 N. Y. 390; *Grannis* v. *Stevens*, 216 id. 583.)

It is argued here that because the defendants would probably be liable on the underwriting agreement of the National Democratic Committee they are liable on the notes. Even if they were liable on the underwriting agreement, they would not be liable on the notes if there was no consideration for them, or if there was an agreement that they should not be binding obligations. A second answer to that proposition is that there was no liability established on the underwriting agreement. It is clear that the underwriting agreement by its terms was conditional, as conditional as the notes, and it is equally clear that the jury must have found that liability on the underwriting agreement never accrued. It is idle to say that parol evidence of these facts could not be given. In an action to show that there is no consideration for a note, or that the note was given conditionally, parol evidence is competent to show the true condition which existed at the time.

The court said in *Miller* v. *McKenzie* (95 N. Y. 575, at p. 578): " Notwithstanding the statement in the note that it was given for cash loaned, it is open to either party to show the true consideration thereof. (1 Parsons on Notes and Bills, 194; *Abbott* v. *Hendricks*, 1 Man. & G. 791; *Wheeler* v. *Billings*, 38 N. Y. 263; *Arnot* v. *Erie Railway Co.*, 67 id. 321.)" (See, also, *Thomas* v. *Scutt, supra.*)

The underwriting agreement is but one piece of evidence. The parol evidence showing that the underwriting agreement was not to be enforcible was just as competent as the evidence to show that the note was given conditionally. A similar condition was present in each instance. In Richardson on Evidence (4th ed.), section 431, the rule is stated as follows:

" § 431. Parol evidence to show conditional delivery of contract. Parol evidence is admissible to show that a contract, other than a deed, in form complete, was not to become binding until the performance of a condition precedent resting in parol. Thus, parol evidence is admissible to show that a contract for the sale of merchandise was executed and delivered on condition that the reports of a commercial agency, as to the buyer's responsibility, should be satisfactory. * * * Whenever a written instrument is delivered manually under an oral agreement that it is not to take effect as a binding obligation except upon the happening of a condition precedent, such oral agreement may be given in evidence for the purpose of showing that no contract ever existed

between the parties; but when a written contract is delivered as a present, binding obligation, with the understanding that it may be canceled upon the happening of a condition subsequent, such oral agreement may not be given in evidence, because it would vary the terms of the written contract. The difficulty lies in determining from the language employed by the parties which of these conditions was intended in a given case.''

The appellant in this case evidently relies to a great extent, for it has cited at length the case of *Kelly* v. *Eggers* (225 App. Div. 511). In that case this court held that a certain condition was a condition subsequent. After a retrial, on appeal (235 App. Div. 53), we held, Mr. Justice O'MALLEY writing the opinion, that the condition was a condition precedent and not a condition subsequent; that a writing which had passed between the immediate parties was admissible in evidence and the main agreement between the payee of the note, the defendant and the corporation, having been specifically referred to therein, it was competent to show by parol evidence, not inconsistent with the main agreement, the full extent and the true nature of the arrangement. Nothing whatever is said in appellant's brief about the opinion on the second appeal after a retrial, which opinion clearly overruled the one relied upon by the appellant and is an absolute authority for defendants' contention, especially with reference to the underwriting agreement.

It is also permissible to show that a contract between parties other than those to the litigation does not fully state the purpose of the contract or that it was a conditional contract.

Section 452 of Richardson on Evidence (4th ed.) so clearly states the rule, which is supported by the cases cited therein, that it is unnecessary to refer to that subject at any greater length. It is there said: '' The rule excluding parol evidence to contradict or vary a written instrument which is the basis of the action is applicable only between the parties to the writing and those claiming under them. It cannot be invoked in favor of or against a stranger to the instrument. *Coleman* v. *First Nat. Bank of Elmira*, 53 N. Y. 388; *Folinsbee* v. *Sawyer*, 157 N. Y. 196; 51 N. E. 994; *Lee* v. *Carson*, 175 App. Div. 104; 161 N. Y. S. 509.''

It has been positively established that the bank had full knowledge of all the facts by virtue of the negotiations between the Democratic National Committee and its officers which involved a loan of $1,500,000 and that the bank in making this ostensible loan was to benefit thereby.

We realize that in many cases where alleged oral agreements are urged, there is actually no basis in fact for same. In this case the overwhelming proof established the existence of the alleged

agreement. Although at first, as Mr. Justice UNTERMYER indicated, such defenses might seem improbable, on their face the record discloses that the defendants' version of the agreement was true.

The motion to set aside the verdict of the jury was properly denied, and the judgment should be affirmed, with costs.

GLENNON, J., concurs.

In each case: Judgment reversed, with costs, and judgment directed for the plaintiff as prayed for in the complaint, with costs.