**BASKIN–ROBBINS INCORPORATED, A Delaware Corporation, Baskin–Robbins USA, Co., A California Corporation, Plaintiffs,**

v.

**S & N PRINJA, INC., A New York Corporation, Neelam Prinja and Yogesh Prinja, Defendants.**

No. 98 CIV.2974 (CM)(MDF).

United States District Court, S.D. New York.

Dec. 20, 1999.

Stephen Horn, Steven A. Browne, Robert L. Zisk, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, Ronald D. Degen, O'Rourke & Degen, PLLC, New York City, for Plaintiffs.

Indra Pal, Brooklyn, NY, for Defendants.

MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM AND DEFENDANTS' THIRD AND FOURTH COUNTERCLAIMS, DENYING SUMMARY JUDGMENT AS TO PLAINTIFFS' SECOND COUNTERCLAIM, GRANTING SUMMARY JUDGMENT TO PLAINTIFFS ON THEIR FIRST COUNTERCLAIM, AND GRANTING IN PART PLAINTIFFS' MOTION TO STRIKE

McMAHON, District Judge.

Plaintiffs Baskin–Robbins Inc. and Baskin–Robbins USA ("Baskin–Robbins") have brought claims against Defendants S & N Prinja, Inc. and Neelam and Yogesh Prinja for (1) failure to make payments for royalties and advertising fees, inventory, supplies, and accrued interest pursuant to the parties' Franchise Agreement ("the Agreement"), and (2) violation of the Lanham Act, 15 U.S.C. § 1114 *et seq.*, for continued use by Defendants of the Baskin–Robbins trademark, trade name, and trade dress after termination of the Agreement. Baskin–Robbins also requests a hearing as to its entitlement to attorney's fees under the Agreement, or an opportunity to submit affidavits on that issue.

Defendants asserted counterclaims for (1) recovery of a $1,000 "Grand Opening Fee" paid to Baskin–Robbins by Defendants under the Franchise Agreement, (2) damages for alleged failure of Baskin–Robbins to deliver ice cream to Defendants on two occasions, (3) lost capital and revenue caused by Baskin–Robbins's refusal to allow Defendants to relocate, and (4) failure of Baskin–Robbins to inform Defendants of a Territorial Agreement allegedly entered into by Dunkin' Donuts, a Baskin–Robbins affiliate, with a third party.

Baskin–Robbins has moved for summary judgment in its favor on its first claim and against Defendants on their counterclaims. It has also moved to strike certain portions of Defendants' Attorney Affirmation and the Affidavit of Neelam Prinja in Opposition to Baskin–Robbins's Motion for Summary Judgment. For the reasons that follow, Baskin–Robbins's Motion for Summary Judgment is granted with respect to its breach of contract claim and Defendants' third and fourth counterclaims, and denied with respect to Defendants' second counterclaim. Summary Judgment is also granted to Defendants on their first counterclaim. Baskin–Robbins's Motion to Strike is granted as to all statements at issue except for a portion of paragraph 3 of the Prinja Affidavit. Finally, Baskin–Robbins's claim for attorney's fees under the Agreement is deferred until after trial.

*Background*

Defendant S & N Prinja ("S & N"), a corporate franchisee, entered into a Franchise Agreement with Baskin–Robbins in May 1994, which authorized S & N to operate a Baskin–Robbins ice cream store at Pacesetter Plaza Shopping Center in Pomona, New York. Defendants Neelam and Yogesh Prinja ("the Prinjas"), the principals of S & N, executed a personal guaranty providing that the Prinjas would guarantee jointly and severally all of S & N's obligations under the Franchise Agreement and that both of them were personally bound by the Agreement's terms. The Agreement further provided that it was to expire on September 23, 1998.

Under the terms of the Agreement, Defendants agreed to the following: pay Baskin–Robbins a monthly royalty fee of .5 percent of the store's gross sales per month; make monthly contributions of 1.5 percent of the store's gross sales per month to a Baskin–Robbins fund to cover advertising costs; pay for all products purchased from Baskin–Robbins; report gross sales to Baskin–Robbins each month; and pay interest of 18 percent on late payments. Moreover, the Agreement stated that failure to pay any fees, invoices, or other charges due under the Agreement for more than five days would constitute default, which authorized Baskin–Robbins to terminate the franchise upon 30 days notice.

Finally, the Agreement granted Baskin–Robbins attorney's fees in specified legal actions against the franchisee. The relevant provisions (1) require the franchisee "to pay all collection charges, including reasonable attorney's fees," (2) require the franchisee to pay attorney's fees in connection with actions to enforce various covenants in the Agreement, (3) require the franchisee to pay Baskin–Robbins "all damages, costs and expenses, including reasonable attorney's fees, incurred by [it] subsequent to the termination or expiration of [the] Agreement in obtaining injunctive relief for the enforcement of any provisions of [ ] Section 17 [of the Agreement governing the obligation of the franchisee to cease use of Baskin–Robbins trademarks and pay all monies owed upon termination of the Agreement]," and (4) entitle the prevailing party "to recover from the other(s) all of the legal expenses of the prevailing party, including reasonable attorney's fees" in actions concerning the construction or validity of the Agreement.

On April 22, 1998, Baskin–Robbins sent Defendants a Notice of Default for failure to pay monies then due under the Agreement and demanded compliance with the Agreement's terms before May 22, 1998. Specifically, Baskin–Robbins alleges that Defendants were delinquent on royalties and advertising fees owed for the months of June 1996 to March 1998, totaling approximately $9,000. Between April 22 and May 22, according to Baskin–Robbins account records, Defendants made four payments amounting to roughly $4,050, but these were treated by Baskin–Robbins as pre-payments for ice cream, and Defendants have not disputed this designation. Defendants made no further payments to

Baskin–Robbins after May 22, and the Agreement was terminated on that date. Baskin–Robbins claims that Defendants continued to do business using its name and trademarks even after the Agreement was terminated until September 1998, in violation of the Lanham Act. Baskin–Robbins has not moved for summary judgment on that claim.

Baskin–Robbins's original Complaint, which was served on Defendants on April 29, 1998, sought an injunction ordering Defendants to cure alleged violations of Baskin–Robbins's health, sanitation, and safety standards, and Baskin–Robbins immediately thereafter moved for a preliminary injunction for the same purpose. However, Baskin–Robbins deemed the alleged violations to have been cured sometime after that point, and withdrew its motion at a hearing before Magistrate Judge Mark Fox on June 15, 1998, but reserved its right to pursue its claim for legal fees. On July 17, 1998, Baskin–Robbins served an Amended Complaint including claims for breach of contract and violation of the Lanham Act arising out of the facts described above, as well as a demand for attorney's fees.

On September 15, 1998, Defendants served an Answer containing three counterclaims for (1) reimbursement of a $1,000 "Grand Opening Fee" paid to Baskin–Robbins under the terms of the Agreement, which provided that the $1,000 was to be used for the advertising and promotion of the opening of the franchisee's store, but in fact was never used for such purpose; (2) roughly $25,000 in damages caused by Baskin–Robbins's failure to deliver prepaid ice-cream on two occasions in June 1997 and December 1997; (3) the refusal of Baskin–Robbins to allow the Prinjas to relocate their store due to Defendants' default under the Franchise Agreement, resulting in damages to Defendants of $250,000 in lost capital and $150,000 in lost net revenues. On February 3, 1999, Defendants filed a Supplemental Counterclaim for damages of $71,692.85 for Baskin–Robbins's alleged failure to disclose to Defendants a sale by Baskin–Robbins's parent company, Allied Domecq, of its franchise rights in Baskin–Robbins to an unidentified third party.

*Baskin–Robbins's Breach of Contract Claim*

Baskin–Robbins argues that it is entitled to summary judgment on its claim for the payments due from S & N under the Franchise Agreement in the amount of $11,233.95, broken down as follows: $7,632.87 for royalties and advertising fees from May 1997 to September 1998; $674.16 for ice cream furnished on September 7, 1998; $499.58 for supplies furnished on March 27 and May 21, 1998; and $2,427.34 in accrued interest from June 1997 to April 1999.

In support of its motion, Baskin–Robbins has submitted the Affidavit of David Barber, a Collection Coordinator for Allied Domecq, which details the nature and amount of the unpaid charges, and four computer printouts from Baskin–Robbins's accounting records: an Accounts Receivable Status Report dated July 27, 1999, indicating total arrears of $11,233.95; Cash Receipts from September 1992 to September 1998; a list of Closed Obligations from October 1991 to September 1998; and a list of Open Obligations from June 1997 to October 1998. (Certification of David Barber, attached as Exhibit 3 to Certifications and Exhibits of Plaintiffs Baskin–Robbins and Baskin–Robbins USA, Co. Submitted in Support of Motion for Summary Judgment.) Defendants have made no showing whatsoever that the disputed payments were made. Instead, they merely state in their brief that they "do not accept the computer printouts of the Plaintiffs," and that the July 1999 Accounts Receivable statement "is disputed" by them because it was not available during discovery. They offer no evidence, however, to cast doubt upon the accuracy of Baskin–Robbins's records. Significantly, none of those records has been submitted in isolation—each is cor-

roborated by the Barber Affidavit, which identifies them from personal knowledge based on Barber's collection duties at Baskin–Robbins. Defendants do state in their Response to Plaintiffs' Local Rule 56.1 Statement that they did in fact make payments from May 1997 through September 1998, but, obviously, an allegation in a Rule 56.1 statement unaccompanied by supporting evidence is not adequate to withstand summary judgment. In view of Defendants' failure to make even a minimally sufficient showing to dispute the accuracy of Baskin–Robbins's records, or to make any showing at all that the fees and royalties were paid, summary judgment is granted on Baskin–Robbins breach of contract claim.

## Defendants' Counterclaims

### (1) Grand Opening Fee

Defendants have counterclaimed for the $1,000 that they paid to Baskin–Robbins as a Grand Opening Fee under the terms of the Agreement, which provided that the fee "shall be applied by area franchisor towards the advertising and promotion of the opening of the retail unit." (Baskin–Robbins Franchise Agreement ¶ 12.4, attached as Exhibit 1A to Baskin–Robbins Certifications.) It is undisputed that no advertising or promotion of the Prinjas' store was undertaken by Baskin–Robbins, and Baskin–Robbins acknowledged Defendants' entitlement to return of the $1,000 in a letter to the Prinjas dated June 25, 1998 from Sally Dutra of Baskin–Robbins's Marketing Department, which stated: "According to our records, you have a balance of $1,000.00 left in your Grand Opening account as of June 19, 1998 ... In order to receive reimbursement, attach copies or original invoices with proof of payment to the enclosed [standard reimbursement] form ... Your reimbursement will be processed directly." (Def.Exh. 2.)

■ Baskin–Robbins makes two arguments in support of its motion as to this claim. First, it asserts that Defendants'

claim is time-barred under the Agreement, which provides that any and all claims or actions arising out of the agreement or the relationship between franchisor and franchisee brought by one party against the other must be commenced "within one year from the discovery of the facts giving rise to any such claim or action, or such claim or action shall be barred ...." (Baskin–Robbins Exh. 1A.) Baskin–Robbins argues that because the original Complaint was filed on April 28, 1998, and Defendants' Answer is dated September 9, 1998—both of which are more than one year after Defendants began seeking reimbursement in 1994—their counterclaim is untimely. I note, however, that not until termination of the Agreement on May 22, 1998 did it become certain that Baskin–Robbins would not carry out any promotion or advertising in connection with the Grand Opening of Defendants' store (the Agreement provided no time limitation within which such advertising or promotion was to be carried out). Defendants' "claim" thus arose on that date, and hence, cannot be dismissed as untimely under the Agreement.

■ Second, Baskin–Robbins points out that Defendants failed to complete a standard Grand Opening Funds Reimbursement Form for the return of the $1,000—a fact undisputed by Defendants. Baskin–Robbins asserts that submission of the completed form was both a company procedure and a "condition precedent" to reimbursement, such that Defendants' neglect to do so precludes them from entitlement to the funds. By this argument, however, Baskin–Robbins is attempting to merge what appears to be an internal procedural requirement into its obligation to return monies provided in consideration for performance it never rendered. The Agreement unambiguously provides that the $1,000 was to be applied by Baskin–Robbins for advertising and promotion, and it has been established that Baskin–Robbins never performed this obligation. While Baskin–Robbins repeatedly asserts

in its affidavits that completion of its reimbursement form was a "condition precedent" to Defendants' recovery of the Grand Opening Fee, the Agreement contains no provision specifying procedures for reimbursement of this or any other funds provided to Baskin–Robbins by the franchisee. Neither has Baskin–Robbins identified any provision of the Agreement that incorporates the company's procedures for reimbursement as a condition precedent to the return of funds not used by Baskin–Robbins as required by its contract with Defendants. Thus, Baskin–Robbins may not rely on an alleged company practice, not provided for under the Agreement, to escape its obligation to repay Defendants as a result of its failure to render performance of the very acts for which Defendants paid the Grand Opening Fee.

■■■■ There is, finally, another basis for finding against Baskin–Robbins on this claim in the elementary principle of contracts law that a pre-existing debt, or "account stated," may serve as consideration for a promise to pay the debt. *See County Trust Co. of New York v. Mara*, 242 A.D. 206, 210, 273 N.Y.S. 597, 603 (1st Dept. 1934); Calamari and Perillo, *Contracts* § 5–3 (3d ed.1987). The June 25 letter from Ms. Dutra, which states that Defendants reimbursement "will be processed directly" upon return of the reimbursement form, amounts to such a promise. Thus, even if Defendants' claim had been untimely under the Agreement, the June 25 letter would constitute a new enforceable promise to repay Defendants for their $1,000 payment.

Although Defendants have not moved for summary judgment, because there exists no issue of fact as to Defendants' entitlement to reimbursement of the Grand Opening Fee, summary judgment on this claim is appropriate. Accordingly, I award Defendants a setoff of $1,000 against Baskin–Robbins's damages for Defendants' breach of the Franchise Agreement. *See* 20 *Am.Jur.2d*, Counterclaim, Recoupment, and Setoff § 37 (1995).

### (2) Undelivered Ice Cream

Defendants allege that Baskin–Robbins failed to deliver ice cream to their store on two occasions, which they claim in their Answer to Plaintiffs' Interrogatories consisted of two days in June 1997 and six days in December 1997. The only evidence in the record that delivery of ice cream was not made are two letters from Neelam Prinja dated December 1, 1997 (attached as Exhibit F to Certifications of Baskin–Robbins in Support of Motion for Summary Judgment) and February 10, 1998 (attached as Exhibit 1 to Defendants' Attorney Affirmation in Opposition to Motion for Summary Judgment) to Baskin–Robbins corporate headquarters in California. The December 1 letter makes reference to Baskin–Robbins's failure to deliver ice cream "during the summer," but makes no mention of the alleged failure to deliver in December.[1] The February 10 letter, which is addressed to a Kimberly Bartoli at Baskin–Robbins, makes reference to a telephone conversation with Ms. Bartoli that morning "regarding non-delivery of Ice Cream due to non-payment of previous dues." Baskin–Robbins claims in its brief that any missed deliveries resulted from

---

**1.** Paragraph Five of the February 10 letter reads as follows:

There were so many instances that even though we had prepaid for our ice cream, we did not get out [sic] delivery and we had to close the store for days together in the peak season resulting in financial loss, estimated between $15,000—$20,000 during the summer. The moneys we had wired or mailed were either posted to wrong store [sic] or kept in suspense. When we call [sic] the accounting/collections department for reconciliation of accounts, we do not get an explanation of our accounts, but instead we received notice of default and termination. Our shipment was stopped abruptly without notice even though the corporation had received the money we wired well in advance. This resulted in the closure of the store for 2 weeks and we had to bear the losses. We had to struggle to have our shipments resumed.

"Defendants' own failure to pay for ice cream in a timely manner" (Pl. Br. at 17), but has provided no evidence to substantiate that assertion. The letters from Neelam Prinja therefore raise an issue of fact as to whether the delivery due in June 1997 was made. On the other hand, there is no evidence from which to infer that Baskin–Robbins failed to make the December 1997 delivery.

■ Baskin–Robbins further argues, however, that Defendants have failed to make a sufficient showing with respect to damages. A plaintiff seeking damages for breach of contract has the burden of proof to establish the measure of damage sustained from the breach. *See* 36 *N.Y.Jur.2d*, Damages § 192 (1984). Defendants have made no allegation or showing of lost profits. The only mention in the record of damages on this claim— which was submitted not by Defendants but by Baskin–Robbins—is Defendants' Answer to Interrogatories from Baskin–Robbins (attached as Exhibit 4H to Certifications and Exhibits of Baskin–Robbins). In that response, Defendants calculated their damages, which they denominate "per diem expenditure loss," at $4,147.70, an amount which Defendants arrived at by (1) dividing the cost of capital improvements for the franchise term by the number of days in their lease (1576 days), and multiplying that figure by eight, the total number of days that Defendants were allegedly forced to close their store; (2) adding the "additional per diem losses" that Defendants claim to have sustained in an amount of 50% of the cost of capital improvements over 60 days; and (3) adding the annual cost of overhead in 1997 divided by 365 days. This methodology is problematic for two reasons. First, Defendants have given no indication that their capital expenditures could have been avoided had Baskin–Robbins delivered ice cream as provided under the Agreement, or any other explanation as to how such routine expenses might be classified as damages. Second, as Baskin–Robbins correctly points out, Defendants could not logically have incurred any overhead costs for days on which it claims to have been closed, so that such costs cannot be a basis for their damages calculation. But apart from these computational flaws, Defendants have not come forward with any evidence of such damages, as opposed to the unsupported assertions contained in the above calculation.

■ Defendants further claim damages of $22,000 in "lost goodwill" as a result of the alleged closures, but again, have provided no substantiation whatsoever for that figure. A plaintiff in a breach of contract action "must produce facts and figures from which the trier of the facts may make an estimate, and the mere statement that he estimates his expenses at a specified figure, without more, is incompetent." 36 *N.Y.Jur.2d*, Damages § 192. Defendants may, however, still be entitled to nominal damages, which satisfy the damages element of a breach of contract claim under New York law. *See Kronos v. AVX Corp.*, 81 N.Y.2d 90, 95, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993) (citing 5 Corbin, *Contracts* § 1001, at 29). I therefore deny summary judgment on their second counterclaim.

*(3) Denial of Permission to Relocate*

■ In their third counterclaim, Defendants allege that on or about March 11, 1998, Baskin–Robbins denied them permission to relocate their store, resulting in damages of $250,000 in lost capital and $150,000 in lost net revenue. Defendants have adduced no evidence from which I could infer the existence of a legal duty to allow them to relocate. They ostensibly attached to their Answer to Baskin–Robbins's Interrogatories a copy of an unidentified Baskin–Robbins policy presumably stating (it is unclear from Baskin–Robbins's description) that franchisees may relocate. Neither party has produced this document to the Court on this motion, however. But even if such a policy had been included in the record presented to

me, the Franchise Agreement contains an integration clause providing that it is the complete embodiment of the parties' agreement. (Franchise Agreement ¶ 24.1, attached as Exh. 1A to Certifications and Exhibits of Baskin–Robbins). The Agreement makes no reference to any such corporate policy; therefore, as a matter of law, it is not part of the Agreement. In the absence of a showing by Defendants of a duty—contractual or otherwise—on the part of Baskin–Robbins to assent to their relocation, this claim is dismissed as well.

### (4) Failure to Disclose the Dunkin' Donuts Territorial Agreement

■ The precise nature of this claim is difficult to decipher from Defendants' Supplemental Counterclaim, but it appears from the Affidavit of Neelam Prinja that this claim stems from a territorial agreement entered into by Dunkin' Donuts—which like Baskin–Robbins is owned by Allied Domecq—with an individual named Ara Ounanian (attached as Exhibit 10 to Defendants' Attorney Affirmation). Defendants allege that they would have made "different business decisions" had they been aware of the territorial agreement, and that Baskin–Robbins's failure to disclose the existence of that agreement by its sister corporation caused them damages in the amount of $71,692.85.

Even accepting Defendants' allegations as true, they have submitted no evidence of any duty owed them by Baskin–Robbins to disclose the existence of such agreements, nor of the damages they allegedly suffered. Accordingly, Baskin–Robbins's motion is granted on this claim.

I also note that Defendants have alluded in their brief to what they portray as an objective on the part of Baskin–Robbins to coerce small franchisees out of business, seemingly to suggest that Baskin–Robbins's legal action against them is merely a vehicle for achieving that end. Consistent with most of their allegations, these assertions are wholly unsupported by evidence.

For the foregoing reasons, Baskin–Robbins's motion for summary judgment is granted on its breach of contract claim and against Defendants on their third and fourth counterclaims, and denied on Defendants second counterclaim. Finally, summary judgment is granted for Defendants on their first counterclaim.

### Baskin–Robbins's Motion to Strike

Baskin–Robbins has also moved to strike certain statements in Defendants' Attorney Affirmation and in the Affidavit of Neelam Prinja. All of those statements either repeat allegations in the complaint or make additional allegations based upon information and belief. The Motion to Strike is essentially moot, as none of the statements, if admissible, would be dispositive of Baskin–Robbins's summary judgment motion. The specific statements at issue in the Attorney Affirmation are:

2. That the crux of the Defendants' counterclaims is that Baskin–Robbins prohibited the Defendants from making sound business decisions in reference to the Baskin–Robbins franchise that they held when the business took a downturn due to the location of the store and the adjacent construction.

3. That Defendants attempted to increase business by adding products such as the Dunkin Donuts line, Exhibit 1, by supplying Baskin–Robbins products off site outlets, Exhibit 1, and finally, selling the franchise to an owner of another Baskin–Robbins franchise at New City, New York. Exhibit 2.

4. That each proposal to increase and improve the business or to protect the Defendants' investment was prohibited by Baskin–Robbins.

5. That the Baskin–Robbins Plaintiffs commenced this action as part of a pattern and practice of closing down Baskin–Robbins stores and opening so-called combo stores selling Baskin–Robbins and Dunkin Donuts products.

6. That upon information and belief, the Baskin–Robbins Defendants were purchased by Allied Domecq, a European based company, which owns Dunkin Donuts and which owned Dunkin Donuts before acquiring Baskin Robbins.

· · · · ·

The relevant statements in the Prinja Affidavit are:

· · · · ·

3. That upon information and belief, the Plaintiffs had a practice whereby an additional $1,000 was paid by prospective franchisees to encourage a grand opening promotion, but in fact, the Plaintiffs simply used this as a mechanism to collect an additional fee which was not refunded to me and, to my knowledge, not to other franchisees. Exhibit 8, at 22 and Exhibit 9.

· · · · ·

6. That the policy of Allied Domecq is to advertise for prospective franchisees of combo or multi-disciplinary stores.

7. That upon information and belief, at the time that the Defendants entered into a franchise agreement with the Plaintiffs, Baskin–Robbins was not wholly owned by Allied Domecq.

· · · · ·

12. That upon information and belief, the so-called violations enumerated at the February, 1998 inspection of the Defendants' Baskin–Robbins store were prepared prior to the inspection.

■■■ Baskin–Robbins correctly points out that statements in an affidavit in opposition to summary judgment must be based upon the personal knowledge of the affiant in order to satisfy Fed.R.Civ.P. 56(e). With the exception of the statement in paragraph 3 in the Prinja Affidavit referring to Baskin–Robbins's failure to refund the Grand Opening Fee, none of the above averments meets that standard. Accordingly, Baskin–Robbins's motion to strike is granted, with the exception of the portion of paragraph 3 of the Prinja Affi-

davit stating "an additional fee which was not refunded to me and, to my knowledge, not to other franchisees."

*Baskin–Robbins Claim for Attorney's Fees*

Finally, Baskin–Robbins seeks attorney's fees as provided under various sections of the Franchise Agreement. I will defer consideration of this claim until after trial.